SURF CITY STEEL, INC. et al.

v.

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION et al.

Case No. CV 14–05604 BRO (SSx)

United States District Court, C.D. California.

Signed June 18, 2015

David A. Rosenfeld, Weinberg Roger and Rosenfeld APC, Alameda, CA, Lisl R. Duncan, Weinberg Roger and Rosenfeld APC, Los Angeles, CA, Paul C. Hetterman, Ronald C. Gladney, Hartnett Gladney Hetterman LLC, St. Louis, MO, for Surf City Steel, Inc. et al.

Robert Remar, Eleanor Morton, Lindsay R. Nicholas, Leonard Carder LLP, San Francisco, CA, Michael Eldredge Plank, Gillian Brett Goldberg, Steven R. Holguin, Holguin Garfield Martinez and Quinonez APLC, Los Angeles, CA, for International Longshore and Warehouse Union et al.

### ORDER RE: MOTION TO DISMISS [48]

BEVERLY REID O'CONNELL, District Judge

#### I. INTRODUCTION

Pending before the Court is Defendants' motion to dismiss Plaintiffs' Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 48.) After consideration of the papers filed in support of and in opposition to the instant motion, the Court deems this matter appropriate for decision without

oral argument of counsel. *See* Fed. R.Civ.P. 78; C.D. Cal. L.R. 7–15. For the following reasons, Defendants' motion is **GRANTED in part** and **DENIED in part.**

## II. BACKGROUND

### A. The Parties

Plaintiffs are comprised of two primary groups. First, Plaintiffs Surf City Steel, Inc. and Sarens USA, Inc. (collectively, the "Employer Plaintiffs") are each California corporations that constitute "employers" within the meaning of 29 U.S.C. § 152(2).[1] (SAC ¶¶ 5–6.) Plaintiffs allege that the Employer Plaintiffs each perform work within the relevant market area described in the SAC and performed relevant work within that market area. (SAC ¶ 7.) Second, Plaintiffs International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers ("Iron Workers"), International Association Local 378, International Association Local 377, International Association Local 433, International Associations Local 29, and International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local 86 (collectively, the "Union Plaintiffs") are labor unions whose members perform relevant work. (SAC ¶¶ 8–13.)

Defendants are also labor unions that "conduct[ ] activities as a labor organization" in the relevant market area as defined in the SAC. (SAC ¶¶ 14–18.) The named Defendants in this action include International Longshore Warehouse Union ("ILWU"), ILWU Local 10, ILWU Local 8, ILWU Local 19, and ILWU Local 13. (SAC ¶¶ 14–18.)

### B. The Relevant Market Area and Relevant Work

As defined in the SAC, the "relevant market area" consists of "those port facilities on the West Coast of the United States within the States of California, Oregon and Washington, including the Long Beach, California Port Facility; the Los Angeles, California Port Facility; the Oakland, California Port Facility; the San Francisco Port Facility; the Portland, Oregon Port Facility; and the Seattle/Tacoma, Washington Port Facility." (SAC ¶ 19.)

The SAC also defines the "relevant work" as: "the labor and services necessary for the non-operational structural maintenance and structural modification of cranes and movement of cranes and all other work in connection therewith; and the jacking, erection and modification of new cranes and of existing cranes and movement of new cranes and existing cranes in connection therewith. This includes the relocation of such cranes when such relocation or movement involves either the installation of new cranes or the jacking, erecting, and modification of existing cranes, including the removal, wrecking and dismantling of such cranes and rubber gantry cranes." (SAC ¶ 20.)

### C. Factual Background

Plaintiffs allege that Defendants have acted in concert with various port managers who conduct business in the relevant market area to monopolize the relevant work market and exclude Plaintiffs from conducting business in the relevant work market area. (SAC ¶ 27.) According to Plaintiffs, in 2008 Defendants entered into

---

1. Section 152(2) states: "The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

an agreement with the port managers—known as the Pacific Coast Longshore Contract Document ("PCLCD")—which covers the relevant work involving ports along the West Coast, including in Long Beach, Los Angeles, Oakland, Oregon, and Washington State. (SAC ¶ 38.) Plaintiffs allege that the purpose and intent of the PCLCD is to eliminate the competition that Defendants would face from Plaintiffs in the relevant market. (SAC ¶ 45.) Plaintiffs further allege that the agreement is not designed to preserve work that Defendants have historically performed, but instead for Defendants to monopolize labor in the relevant market to control the price of labor. (SAC ¶¶ 41–58.) Plaintiffs claim that the PCLCD has no pro-competitive justification. (SAC ¶ 59.)

Additionally, the PCLCD includes a mandatory grievance and arbitration process, by which Defendants have enforced the agreement against Plaintiffs. (SAC ¶ 39.) The SAC asserts that the PCLCD's arbitration mechanism effectively prohibits Plaintiffs—who are not signatories to the PCLCD—from bidding on projects and performing work that they have traditionally performed in the relevant market area. (SAC ¶¶ 60–68.) In support of these allegations, Plaintiffs provide a number of factual examples in which Plaintiffs were precluded from bidding or working on certain projects in the relevant market area because they were not ILWU contractors. (*See* SAC ¶¶ 69–89.)

### D. Procedural History

As a result of these allegations, Plaintiff Iron Workers sent ILWU a letter in June 2014 in which Iron Workers accused Defendants of violating federal antitrust laws. (SAC ¶ 68.) When ILWU did not respond, Plaintiffs filed their Complaint on July 18, 2014. (Dkt. No. 1.) On October 9, 2014, Defendants filed a motion to dismiss the Complaint, (Dkt. No. 27), which the Court granted on January 20, 2015 with leave to amend, (Dkt. No. 40). Plaintiffs then filed a First Amended Complaint on February 9, 2015. (Dkt. No. 41.) On February 23, 2015, Defendants filed a motion to dismiss the First Amended Complaint, (Dkt. No. 42), which the Court granted on April 6, 2015, again with leave to amend, (Dkt. No. 46).

Plaintiffs then filed the SAC on April 20, 2015. (Dkt. No. 47.) In the SAC, Plaintiffs allege three causes of action for: (1) violation of sections 1 and 2 of the Sherman Act, (SAC ¶¶ 90–130); (2) breach of contract, (SAC ¶¶ 131–42); and (3) violation of section 303 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 187, (SAC ¶¶ 143–62). Defendants then brought the instant motion to dismiss the SAC on May 4, 2015. (Dkt. No. 48.) Plaintiffs opposed this motion on May 21, 2015, (Dkt. No. 50), and Defendants replied on June 8, 2015, (Dkt. No. 51).

### III. LEGAL STANDARD

Under Rule 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, there must be "more

than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief. *Id.*

Where a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.2008) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."). But leave to amend "is properly denied ... if amendment would be futile." *Carrico v. City & Cnty. of S.F.*, 656 F.3d 1002, 1008 (9th Cir.2011).

## IV. DISCUSSION

As in the previous two motions to dismiss, Defendants seek dismissal of each of Plaintiffs' claims for (1) violation of section 303 of the LMRA; (2) violations of federal antitrust law; and (3) breach of contract. The Court will discuss each claim in turn.

### A. Section 303 of LMRA

Section 303 of the LMRA "provides a judicial forum to pursue damages resulting from certain unfair labor practices committed by a union." *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1149 (9th Cir.2013). Plaintiffs allege that Defendants have committed unfair labor practices because their conduct violates section 8(b)(4) of the LMRA, 29 U.S.C. § 158(b)(4). (SAC ¶ 143.) Defendants make two arguments in favor of dismissing Plaintiffs' LMRA claims. First, Defendants argue that the Union Plaintiffs lack standing to assert such a claim. Second, Defendants contend that Plaintiffs have failed to allege a "secondary objective" as required by section 303 of the LMRA.

### 1. The Union Plaintiffs Lack Standing

The Ninth Circuit has held that "Section 303's requirement that an injury occurs 'by reason of' a Section 8(b)(4) violation 'imposes standing limitations.'" *Am. President Lines*, 721 F.3d at 1153 (quoting *Fulton v. Plumbers & Steamfitters*, 695 F.2d 402, 405 (9th Cir.1982)). To determine whether section 303 standing exists, courts are to look to: "(1) the nexus between the injury and the statutory violation; and (2) the relationship between the injury alleged and the forms of injury that Congress sought to prevent or remedy by enacting the statute." *Id.* And to determine the relationship between the injury and the statutory violation, courts "examine whether the plaintiff 'was within the target area of the defendant's illegal practices and was not only hit, but also aimed at.'" *Id.* (quoting *Fulton*, 695 F.2d at 406).

In their SAC, Plaintiffs allege that the Union Plaintiffs have standing to pursue their LMRA claims because the Union Plaintiffs suffered the injury of lost union members and thus lost dues resulting from their members' decision to withdraw and join Defendants. (SAC ¶¶ 107(c), 159(c); *see also* Opp'n at 2, 5 & n.2.) Defendants, however, argue that the Ninth Circuit's holding in *Fulton* forecloses the Union Plaintiffs from having standing under section 303, regardless if they express their injury in terms of their members' interests or their ability to acquire member dues. (Mot. at 4.)

In *Fulton*, the Ninth Circuit held that "employees of an enterprise injured by a union's violation of section 8(b)(4)(D) of the LMRA [do not] have standing under section 303 of the LMRA to maintain a suit for damages against the offending union."

695 F.2d at 405, 407–08. In doing so, the court noted that the "principal object of [defendant] unions' illegal activities was to pressure the site employer to reassign work from the members of the [plaintiffs' union] to members of the [defendant's] unions," which caused the site employer to "respond[ ] by suspending operation and temporarily laying off workers." *Id.* at 407. The court found that "[t]his consequence was not a 'necessary and integral' aspect of the section 8(b)(4)(D) violation," and therefore that "[t]he injury alleged [was] too remote from the alleged violation to warrant section 303 standing." *Id.*; *accord Prater v. United Mine Workers of Am., Dists. 20 & 22*, 793 F.2d 1201, 1206 (11th Cir.1986) (applying *Fulton* to determine that employees lack standing to sue under section 303); *Starks v. Perloff Bros.*, 760 F.2d 52, 53 (3d Cir.1985) (finding that plaintiffs—warehousemen who were members of defendant union—lacked standing to sue defendant under section 303); *Schrader v. Sheet Metal Workers Int'l Ass'n Local Union No. 20*, 656 F.Supp. 1487, 1498 (N.D.Ind.1987) ("Courts have held in a variety of factual situations ... that employees may not sue for damages pursuant to § 303 arising out of secondary activity.").[2]

While this case involves plaintiffs who are unions rather than employees who are *members* of a union, the analysis remains the same. The Union Plaintiffs must demonstrate that there is a "nexus between the injury and the statutory violation," and that the "relationship between the injury alleged" is one of the "forms of injury that Congress sought to prevent or remedy by enacting the statute." *Am. President Lines*, 721 F.3d at 1153 (quoting *Fulton*, 695 F.2d at 405). Here, however, the injury alleged in the SAC is even more remote from the alleged violation of section 303 than that described in the initial Complaint. In their original Complaint, Plaintiffs alleged that Defendants' conduct had caused signatories to the PCLCD to "cease or refrain from doing business with Plaintiff employers and others who are signatory to an agreement with Plaintiff Unions," (Compl. ¶ 93), which consequently prevented members of the Union Plaintiffs from working. In their First Amended Complaint and in the SAC, Plaintiffs have added another layer to the causal chain, claiming that because the union members are not working, they are leaving the unions, which in turn causes the Union Plaintiffs to suffer a decrease in the union dues that they collect. (*See* SAC ¶¶ 107(c), 159(c).) But a decrease in union dues is not a "necessary and integral aspect" of the alleged LRMA violation, *Fulton*, 695 F.2d at 407, and thus Plaintiffs' allegation does not form a sufficient nexus between the injury and statutory violation. *Id.* at 405. The Court therefore concludes that the Union Plaintiffs lack standing to pursue their LMRA claims.

### 2. Secondary Objective

■ Defendants also argue that all Plaintiffs' LMRA claims should be dismissed because they fail to state a viable

---

2. The District of Columbia Circuit persuasively explained the reasons for limiting standing pursuant to section 303: "The practical reasons justifying the view that section 303 imposes significant standing requirements are quite simple. Absent such requirements, 'unlimited liability under § 303 might produce financial disaster for unions and inhibit the exercise of the right to strike.' In light of these considerations, it has been clear to the courts that 'the imposition of unlimited liability under section 303 would tend to subvert our national labor policy.' " *Charvet v. Int'l Longshoremen's Ass'n, AFL–CIO*, 736 F.2d 1572, 1575 (D.C.Cir.1984) (internal citations and modifications omitted) (quoting *W.J. Milner & Co. v. Int'l Bhd. of Elec. Workers, Local 349*, 476 F.2d 8, 12 (5th Cir.1973); *Fulton*, 695 F.2d at 408).

claim in the SAC. Plaintiffs' LMRA claim is predicated upon a violation of section 8(b)(4)(ii)(A) of the LRMA, which prohibits a union from "forc[ing] or requir[ing] an employer to enter into a 'hot cargo' agreement prohibited by Section 8(e)." *Am. President Lines*, 721 F.3d at 1153. An example of such an agreement is a "union signatory" clause, "which prohibits the employer from subcontracting with all employers who are not union signatories." *Id.*; *accord N.L.R.B. v. Hotel & Rest. Emps. & Bartenders' Union Local 531*, 623 F.2d 61, 67 (9th Cir.1980) ("[I]t is well settled that union signatory clauses violate section 8(e)."). To state an LMRA claim, Plaintiffs must therefore adequately allege that Defendants have violated section 8(b)(4) by enforcing an agreement that is prohibited under section 8(e), and that they consequently suffered damages as a result. *Am. President Lines*, 721 F.3d at 1157.

Plaintiffs state in the SAC that Defendants have, pursuant to the PCLCD, conspired with port managers to prohibit them from doing business with contractors who are not signatories to the PCLCD, thus precluding the Employer Plaintiffs from bidding on certain projects. (*See*, *e.g.*, SAC ¶¶ 27, 38, 39, 45–51.) Plaintiffs contend that Defendants carried out this conspiracy by including a "cease doing business" provision in violation of section 8(e) of the LMRA, which they have enforced through a grievance and arbitration process. (Opp'n at 14.) As in their previous complaints, Plaintiffs cite the following language from the PCLCD as evidence of a "cease doing business" provision:

> Section 1.7. This contract document shall apply to the maintenance and repair of containers of any kind and of chassis, and the movement incidental to such maintenance and repair.
>
> Section 1.71. This contract document shall apply to the maintenance and repair of all stevedore cargo handling equipment.
>
> Section. 1.72. It is agreed that the jurisdiction of the ILWU shall apply to the maintenance and repair of all present and forthcoming stevedore cargo handling equipment in accordance with Sections 1.7 and 1.71....

(SAC ¶ 38.) Yet Plaintiffs do not demonstrate how these sections actually constitute a "cease doing business" provision. Instead, Plaintiffs again rely on conclusory allegations to support this position, stating, for example: "These provisions have been interpreted and enforced by the Defendants, through grievance and arbitration procedures to require that the relevant work performed in the relevant market area must be assigned to the Defendants and to contractors who only employ ILWU members." (SAC ¶ 39.)

The Ninth Circuit has noted that, "[i]n rare cases, [a] union can commit a predicate unfair labor practice through its conduct in an arbitration proceeding." *Am. President Lines*, 721 F.3d at 1149. In such cases, "[t]he Section 8(b)(4) violation occurs the moment the union pursues arbitration with an unlawful secondary motive." *Id.* at 1155. In this context, labor agreements are considered either "primary" or "secondary," the former being permissible while the latter are not. *See N.L.R.B. v. Int'l Longshoremen's Ass'n, AFL–CIO*, 473 U.S. 61, 78–79, 105 S.Ct. 3045, 87 L.Ed.2d 47 (1985). For purposes of determining whether an agreement is primary or secondary, "[t]he touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-à-vis [its] own employees," *Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 645, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967)—that is, whether the agreement's "object ... is to benefit the employees of the bargaining

unit represented by the union." rather than to apply pressure to a "[neutral] employer in order to require [it] to accede to union objectives." *A. Duie Pyle, Inc. v. N.L.R.B.*, 383 F.2d 772, 776 (3d Cir.1967); *accord Peabody Holding Co. v. United Mine Workers of Am., Int'l Union*, 41 F.Supp.3d 494, 504–05 (E.D.Va.2014).

Here, Plaintiffs allege that the purpose of Defendants' grievance and arbitration mechanism "is to eliminate competition which Defendants would face from Plaintiff unions and their affiliated contractors," and that the agreement is "an effort to restrain trade and monopolize the relevant work by prohibiting non-ILWU signatory contractors and unions from bidding the relevant work." (SAC ¶¶ 44–45.) These bare assertions of a secondary purpose are conclusory. Plaintiffs do not allege any *facts* from which the Court could infer that the purpose of these arbitration proceedings was to pressure contractors not to allow Plaintiffs (or other non-ILWU signatories) to work or bid on their projects. Without any specific factual allegations from which the Court could infer that Defendants actually instituted such a "cease doing business provision," Plaintiffs have failed to adequately plead a violation of section 8(e) of the LMRA. Accordingly, the Court finds that Plaintiffs have again failed to state a claim under the LMRA.

### B. Antitrust

Defendants seek to dismiss Plaintiffs' antitrust claims on three grounds. First, Defendants claim that the Union Plaintiffs lack standing to assert an antitrust claim. Second, Defendants contend that their al-leged conduct is exempt from antitrust law. And third, Defendants argue that Plaintiffs have failed to state a claim for attempted monopoly.

### 1. The Union Plaintiffs Lack Standing

■ To begin, Defendants assert that the Union Plaintiffs lack standing to pursue an antitrust claim.[3] Indeed, the Supreme Court has observed that unions will often lack antitrust standing because it is often not clear whether a union's interests would be served by enhanced competition in the market:

> As a general matter, a union's primary goal is to enhance the earnings and improve the working conditions of its membership; that goal is not necessarily served, and indeed may actually be harmed, by uninhibited competition among employers striving to reduce costs in order to obtain a competitive advantage over their rivals.... Set against this background, a union, in its capacity as bargaining representative, will frequently not be part of the class the Sherman Act was designed to protect, especially in disputes with employers with whom it bargains.

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539–40, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) [hereinafter *AGC*]. Nevertheless, the Court held that, "[i]n each case [a union's] alleged injury must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall." *Id.*

---

**3.** "Antitrust standing" is a distinct inquiry from that of constitutional standing. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.* "This determination of antitrust standing requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them." *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448–49 (9th Cir.1985).

In *AGC*, the Supreme Court identified a number of factors that courts are to apply when evaluating whether an antitrust plaintiff has standing. These factors include: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir.1999).[4] The Court will address each of these factors in light of Plaintiffs' amendments to the First Amended Complaint.

### a. The Nature of the Union Plaintiffs' Alleged Antitrust Injury

The first factor addresses whether the Union Plaintiffs' alleged injury is the result of anti-competitive behavior "that antitrust law was intended to forestall"—that is, whether it was the result of anti-competitive behavior. *Eagle*, 812 F.2d at 540. "The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." *Id.* A plaintiff "who is 'neither a competitor nor a consumer' in the relevant market does not suffer 'antitrust injury.'" *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir.1996) (quoting *In re Ins. Antitrust Litig.*, 938 F.2d 919, 926 (9th Cir.1991)). In their SAC, Plaintiffs define the relevant market as including the "labor and services necessary for the non-operational structural maintenance and structural modification of cranes and movement of cranes and all other work in connection therewith; and the jacking, erection and modification of new cranes and of existing cranes and movement of new cranes and existing cranes in connection therewith." (SAC ¶ 20.)

This Court previously held that the Union Plaintiffs are neither consumers nor competitors in the market of construction, maintenance, and structural modification of cranes and movement of cranes, and that, consequently, the Union Plaintiffs were not in competition in the market in which the alleged antitrust violation occurred. (Dkt. No. 40 at 12–13.) Nevertheless, Plaintiffs argue that they compete with Defendants "to supply the labor used by the contractors who perform the relevant work." (Opp'n at 8 (citing SAC ¶¶ 22, 38–43).) As this sentence implicitly concedes, however, it is the laborers they supply—*i.e.*, the employees whom the Union Plaintiffs represent—who perform the relevant work and who thus are the competitors in the market. *See Eagle*, 812 F.2d at 541 ("The vessel owners are requisite 'sellers' in the relevant market, not the crewmembers or the union. Thus, the class members have not alleged the type of injury antitrust laws were intended to forestall, because the alleged anticompetitive conduct was directed at the vessel owners, not the crewmembers or the union.").[5] The Union Plaintiffs' participation in the relevant market is thus derivative of

4. The Ninth Circuit has summarized the *AGC* factors in various ways, but the analysis remains the same in each case. *See, e.g., R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir.1989); *Sacramento Valley, Chapter of the Nat'l Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers, Local 340*, 888 F.2d 604, 605 (9th Cir.1989); *Eagle. v. Star–Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir.1987).

5. To the extent that *Connecticut Ironworkers Employers Association v. New England Regional Council of Carpenters*, No. 3:10CV165 SRU, 2012 WL 951793, at *14 (D.Conn. Mar. 20, 2012), suggests otherwise, the Court respectfully declines to follow this holding in light of the Ninth Circuit's holding in Eagle.

the work performed by the laborers whom they represent.[6]

Alternatively, Plaintiffs argue that the labor and services markets are separate, but that they are so inextricably intertwined that the Union Plaintiffs' injuries were suffered as participants in the relevant market. (Opp'n at 8–9.) In support of this position, Plaintiffs cite to *In re Lithium Ion Batters Antitrust Litigation*, No. 13–MD–2420 YGR, 2014 WL 4955377, at *12 (N.D.Cal. Oct. 2, 2014), as an example of markets that are so inextricably linked that an antitrust violation in one is sufficient to find an antitrust injury in the other. As Defendants argue, however, the Union Plaintiffs are not competitors or consumers in either the labor or services markets. Rather, the Employer Plaintiffs provide the services in the relevant market, and their employees provide the labor. As collective bargaining agents, the Union Plaintiffs participate in these markets only derivatively based on their representation of the direct participants. That is insufficient to confer antitrust standing. *See Eagle*, 812 F.2d at 541. Thus, this factor weighs against finding antitrust standing.

### b. The Directness of the Alleged Injury

The second factor to determine antitrust standing considers the directness of the alleged injury. When analyzing this factor, "[t]he chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate victims' of any alleged antitrust violation. Generally, employees have been denied standing where their injuries were merely derivative of that of the employer." *Id.* Plaintiffs argue that the alleged injury

was direct because the Union Plaintiffs were the intended target of Defendants' wrongful conduct. (Opp'n at 10–11.)

The Court has already held that the economic injury of lost revenue from union dues is derivative of the alleged injury suffered by the union members. (Dkt. No. 40 at 13–14; 46 at 12.) As the Court explained, any economic injury suffered by the Union Plaintiffs must be a result of the dues paid to them by their members, which presumably decrease when their members are prevented from bidding or working on certain projects. (Dkt. No. 40 at 13.) Nevertheless, Plaintiffs rely on *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)—as they did in opposing Defendants' previous motion to dismiss—for the proposition that unintended victims with indirect injuries may still have antitrust standing, and that, consequently, intended victims would necessarily have antitrust standing. In *McCready*, the Supreme Court held that victims who suffer indirect injuries have antitrust standing when the harm was "clearly foreseeable" and when "there can be no question but that the loss was precisely 'the type of loss that the claimed violations ... would be likely to cause.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). The plaintiff in *McCready* was a consumer in the relevant market who was injured by the defendants' acts to restrain competition in that market. *See AGC*, 459 U.S. at 538, 103 S.Ct. 897 (discussing *McCready*).

Here, the Union Plaintiffs offer no facts to support the position that the alleged injury was "clearly foreseeable" or "the

---

**6.** Were Plaintiffs to define the relevant market as, for example, that of labor union membership dues, the result may be different, as the Union Plaintiffs' only alleged injury is a reduction of such dues as a result of their members terminating their membership and join-

ing Defendants' unions. (*See, e.g.,* SAC ¶ 159(c).) It is thus plausible to conclude that the Union Plaintiffs are competing with Defendants for union membership dues, but it is not reasonable to conclude that they compete in the relevant market as defined in the SAC.

type of loss that the claimed violations ... would be likely to cause." *McCready*, 457 U.S. at 479, 102 S.Ct. 2540. Instead, Plaintiffs provide only the conclusory statement that the Union Plaintiffs were the target of Defendants' unlawful conduct and therefore have standing. (Opp'n at 10.) That is insufficient. *See Lucas v. Bechtel Corp.*, 800 F.2d 839, 846 n. 9 (9th Cir.1986) (rejecting similar argument). As a result, the Court finds that the Union Plaintiffs are not consumers within the relevant market and therefore are not the parties who would likely suffer from the claimed violation. The Union Plaintiffs fail to provide facts to demonstrate a direct injury, and thus the second factor weighs against antitrust standing.

### c. The Speculative Measure of the Damages

 As in its previous orders, the Court will consider the third factor—whether the measure of damages is speculative—and the fifth factor—the complexity in apportioning damages—together. (*See* Dkt. Nos. 40, 46.) "Two factors have been identified by the Supreme Court as indicating the speculative nature of a damage claim: (1) the indirectness of the alleged injury, and (2) that the alleged effects may have been produced by independent factors." *Eagle*, 812 F.2d at 542. In the context of a union's indirect injuries in an antitrust case, distinguishing the Union Plaintiffs' injuries from those of its members can prove troublesome. *See Sacramento Valley*, 888 F.2d at 609.

The Union Plaintiffs claim that the measure of their damages is simple because the damages only include lost revenue from the lost member dues of employers who left the Union Plaintiffs for Defendants. (Opp'n at 11–12.) Yet Plaintiffs ignore that this injury is indirect, which necessarily raises the issue of additional independent factors in the analysis of damages. *See Eagle*, 812 F.2d at 542;

*Sacramento Valley*, 888 F.2d at 609 ("[T]he alleged 'loss of work opportunities' could be the result, at least in part, of a wide variety of independent factors having nothing to do with the alleged conspiracy."). Therefore, Plaintiffs' assertion that the measure of damages will be "easy" is conclusory and unsupported. Moreover, as the Court explained in its prior orders, the Union Plaintiffs' injury is derivative of its members' inability to bid for work or obtain work in the relevant market area. (Dkt. No. 40 at 14; 46 at 13.) Consequently, the Union Plaintiffs' injury must be calculated by determining an undefined share of their members' losses. Simply referring to this determination as "easy" does not cure the deficiencies that the Court has identified in the Union Plaintiffs' pleadings. Accordingly, these factors both weigh against finding antitrust standing because permitting the Union Plaintiffs to proceed on their antitrust claim could cause "problems of identifying damages and apportioning them among directly victimized contractors and subcontractors and indirectly affected employees and union entities." *AGC*, 459 U.S. at 545, 103 S.Ct. 897.

### d. The Risk of Duplicative Discovery

 The final factor is the risk of duplicative discovery. "The risk to be avoided under this factor is that potential plaintiffs may be in a 'position to assert conflicting claims to a common fund ... thereby creating the danger of multiple liability for the fund.' " *Eagle*, 812 F.2d at 542 (modification in original) (quoting *AGC*, 459 U.S. at 544, 103 S.Ct. 897). Plaintiffs again rely on the assertion that calculating the Union Plaintiffs' damages will be "simple" and based on the decrease in union members paying dues to the Union Plaintiffs. Plaintiffs are asking this Court to measure "damages and apportion[ ] them among directly victimized con-

tractors and subcontractors and indirectly affected ... union entities." *AGC*, 459 U.S. at 545, 103 S.Ct. 897. Yet such a task would require the Court to determine "the extent to which the affected employees absorbed their losses and continued to pay union dues" to the Union Plaintiffs, and these employees could potentially still be linked to damages affecting the Employer Plaintiffs. *Id.* As a result, the Union Plaintiffs' damages result from the injuries allegedly sustained by their members, and allowing both the affected union members and the unions themselves to sue would create the potential for multiple liability. *See id.* at 544, 103 S.Ct. 897. ("[P]otential plaintiffs at each level in the distribution chain would be in a position to assert conflicting claims to a common fund, ... thereby creating the danger of multiple liability for the fund and prejudice to absent plaintiffs."). Accordingly, this factor also weighs against antitrust standing.

As discussed above, all five factors identified by the Supreme Court in *AGC* weigh against finding that the Union Plaintiffs have antitrust standing. As a result, the Union Plaintiffs' antitrust claims are hereby **DISMISSED.**[7]

## 2. The Nonstatutory Labor Exemption

Defendants next argue that the conduct alleged in the SAC is exempt from antitrust law under the nonstatutory labor exemption. (Mot. at 14.) Plaintiffs contend that consideration of the nonstatutory exemption is inappropriate at this stage of the proceedings on the basis that it is an affirmative defense. (Opp'n at 18–19.) As the Court explained in its prior orders, however, "[w]hether the case can be dismissed on the pleadings depends on what the pleadings say. '[A] plaintiff may plead herself out of court.' If the pleadings establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts." *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n. 1 (9th Cir.1997) (second modification in original) (citation omitted) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir.1995)). While the Court may not consider evidence or factual matter not presented in the pleadings or the judicially noticed documents, the Court can determine whether Defendants' conduct, as alleged by Plaintiffs, is exempt under the nonstatutory labor exemption. *See Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, 15 F.Supp.3d 1075, 1090–95 (D.Or.2014) [hereinafter *ICTSI*] (finding defendant union's conduct to be exempt under nonstatutory labor exemption on motion to dismiss). The only possible "agreement in restraint of trade" that Plaintiffs identify in the SAC is the PCLCD, so it is that agreement that the Court will consider in determining whether Defendants' conduct is exempt.

 Defendants argue that the PCLCD's provisions requiring its signatories to assign projects to ILWU labor are covered by the nonstatutory labor exemption. To determine whether the nonstatutory labor exemption applies, the Ninth Circuit has adopted the Eighth Circuit's test from *Mackey v. National Football League*, 543 F.2d 606 (8th Cir.1976). *See Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*, 81 F.3d 858, 861 (9th Cir.1996). "Under that test, the parties to an agreement restraining trade are exempt from

---

**7.** The Court finds Plaintiffs' reliance on *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 746 (9th Cir.1984) [hereinafter *Ostrofe II*], to be inapposite. Since its holding in *Ostrofe II*, the Ninth Circuit has made clear that "[t]he exception recognized in *Ostrofe II* is limited to those cases in which a dismissed employee is an 'essential participant' in an antitrust scheme, the dismissal is a 'necessary means' to accomplish the scheme, and the employee has the greatest incentive to challenge the antitrust violation." *Vinci*, 80 F.3d at 1376.

antitrust liability only if (1) the restraint primarily affects the parties to the agreement and no one else, (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining, and (3) the agreement is produced from bona fide, arm's-length collective bargaining." *Phoenix Elec. Co.*, 81 F.3d at 861. To obtain dismissal of Plaintiffs' antitrust claims, Defendants must demonstrate that the factual allegations in the SAC establish *each* of these factors.[8]

### a. The PCLCD Primarily Affects Only the Parties to the PCLCD

First, the Court considers whether the PCLCD "primarily affects" only the parties to the agreement.[9] The copy of the PCLCD of which the Court has previously taken judicial notice makes clear that the parties are Defendant ILWU and the Pacific Maritime Association ("PMA"). Moreover, the very same agreement was the subject of the court's analysis in *ICTSI*, in which the court described the agreement as a "collective bargaining agreement covering commercial ports along the West Coast, which governs the terms and condi-

tions of employment of all Fongshore workers." 15 F.Supp.3d at 1086.

Defendants argue that the PCLCD does not affect other parties who are not signatories to the agreement. As the Court concluded in its prior order, the terms of the PCLCD support Defendants' position. (Dkt. No. 46 at 16.) The PCLCD does not on its face impose any obligations on third parties who are not signatories to the agreement.[10] Yet Plaintiffs allege that they are primarily affected because they can no longer compete for the relevant work in the relevant market, while Defendants are not primarily affected because they are not required to change any of their practices based on the agreement. (Opp'n at 21.)

In support of their position, however, Plaintiffs merely provide conclusory allegations that they are the ones primarily affected by the PCLCD. (Opp'n at 21–22; *see, e.g.*, SAC ¶ 117 ("The Plaintiff unions and contractors are primarily affected by these provisions in that the work which otherwise would be awarded to and performed by the Plaintiff contractors and Plaintiff unions must be awarded to the

---

8. Plaintiffs claim that there are actually five elements to this test "when these cases are considered in context," but they do not adequately explain what the additional elements should be. (*See* Opp'n at 20.) Moreover, the Court has already rejected Plaintiffs' attempt to impose the additional requirement that "the provisions in question must address the labor relationship between an employer and its employees," (Opp'n at 20). (*See* Dkt. No. 46 at 15.) And as the Court explained in its prior order, the three-part test from *Mackey* was designed to be applicable to different types of cases. *See Phoenix Elec. Co.*, 81 F.3d at 861; *Mackey*, 543 F.2d at 613–14 ("Although the cases giving rise to the nonstatutory exemption are factually dissimilar from the present case, certain principles can be deduced from those decisions governing the proper accommodation of the competing labor and antitrust interests involved here.").

9. The Court has already taken judicial notice of the PCLCD and Article XX of the American Federation of Labor–Congress of International Organizations ("AFL–CIO") Constitution in its first order granting Defendants' motion to dismiss. (Dkt. No. 40.)

10. While the factual findings of the court in *ICTSI* are not binding on this case, the Court notes that the court interpreted the PCLCD as primarily affecting only the ILWU and PMA—the parties to the agreement. *See ICTSI*, 15 F.Supp.3d at 1093 ("The requirement that ILWU workers be assigned the work, however, is only binding on PMA members, who are parties to the collective bargaining agreement."); *id.* at 1093 n. 8 ("Here, the alleged agreement is the PCLCD, and it does not impose the requirement that ILWU-represented workers be assigned reefer work on any nonsignatory party.").

Defendants.").) Yet Plaintiffs provide no facts (other than a general description of the parties' historic practices prior to the year in which the PCLCD was enacted, (*see* SAC ¶¶ 29–39)) to suggest that the PCLCD imposes its terms on any third party, relying instead on this conclusory statement that the PCLCD had a primary effect on a third party. In absence of such factual allegations, and in light of the PCLCD's plain language imposing obligations only on the signatories to the agreement, the Court concludes that Plaintiffs are not primarily affected by the PCLCD.

### b. The PCLCD Concerns Mandatory Subjects of Collective Bargaining

■ Second, the Court considers whether the PCLCD concerns "mandatory subjects of collective bargaining." Plaintiffs contend that the subcontracting provision at issue in the PCLCD—which requires PCLCD signatories to use ILWU labor in relevant work projects—is not a mandatory subject of collective bargaining because work assignment through subcontracting is not necessarily a mandatory subject. (Opp'n at 22 (citing *Fibreboard Paper Prods. v. N.L.R.B.*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *N.L.R.B. v. Wehr Constructors*, 159 F.3d 946, 953 (6th Cir.1998); *AMCAR Div., ACF Indus., Inc. v. N.L.R.B.*, 596 F.2d 1344, 1348 (8th Cir.1979)).) Pursuant to the authorities cited by Plaintiffs, the Court must consider whether the matter is "peculiarly suitable for resolution within the collective bargaining framework" and "amenab[le] ... to the collective bargaining process." *Fibreboard*, 379 U.S. at 211, 85 S.Ct. 398.

As the Court explained in its prior order, (Dkt. No. 46 at 17), the relevant provisions of the PCLCD define the work at issue and assign that work to ILWU members, (*see* Dkt. No. 28 at 21). In fact, this Court has already found that the PCLCD's subcontracting clause constitutes a work assignment. (*See* Dkt. No. 40 at 18–19) And the caselaw is clear that "[w]ork assignments are mandatory subjects of collective bargaining, even if the employer is assigning work outside of the collective bargaining unit." *ICTSI*, 15 F.Supp.3d at 1094.[11] Plaintiffs do not allege any other subject covered by the PCLCD that is not a mandatory subject of collectively bargaining. Accordingly, the Court finds that the second factor of the *Mackey* test is satisfied as well.

### c. Arm's–Length Collective Bargaining

■ Third, the Court examines whether the PCLCD was the product of bona fide, arm's-length collective bargaining. Unlike in the initial Complaint, which was silent on this issue, Plaintiffs now claim that the PCLCD was *not* the result of bona fide arms-length bargaining. (*See* SAC ¶ 125.) While these statements are largely conclusory, Plaintiffs are "not re-

---

11. *Accord N.L.R.B. v. Solutia, Inc.*, 699 F.3d 50, 70 (1st Cir.2012) (stating that "'jurisdictional' clauses that define the assignment of work to union members ... address[ ] a mandatory subject of bargaining"); *McKenzie Eng'g Co. v. N.L.R.B.*, 303 F.3d 902, 908 (8th Cir.2002) (observing that "assignment of work to union members" was "a mandatory subject of collective bargaining"); *Local 58, Int'l Bhd. of Elec. Workers, AFL–CIO v. Se. Mich. Chapter, Nat'l Elec. Contractors Ass'n, Inc.*, 43 F.3d 1026, 1032 (6th Cir.1995) (noting that "work assignment" and "jurisdiction" are "two mandatory subjects of bargaining"); *Chem. Leaman Tank Lines, Inc. v. Cent. Conference of Teamsters Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, No. 93 C 51, 1993 WL 214119, at *5 (N.D. Ill. June 17, 1993) ("It is well settled that clauses concerning the assignment of work to union members are mandatory subjects of bargaining ...."); *Antelope Valley Press*, 311 N.L.R.B. 459, 460 (1993) ("The assignment of work affects terms and conditions of employment, and therefore is a mandatory bargaining subject ....").

quired to plead on the subject of an anticipated affirmative defense." *United States v. McGee*, 993 F.2d 184, 187 (9th Cir.1993); *accord Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir.2013) ("[P]laintiffs ordinarily need not plead on the subject of an anticipated affirmative defense. When an affirmative defense is obvious on the face of a complaint, however, a defendant can raise that defense in a motion to dismiss." (internal citation and quotation marks omitted)). As explained above, to determine that the nonstatutory labor exemption applies at this stage, it must be clear either from the allegations in the complaint or from judicially noticed facts that all three elements of the *Mackey* test are satisfied. *See Weisbuch*, 119 F.3d at 783 n. 1. And it is not clear from either the text of the PCLCD or the SAC that the PCLCD is the product of arm's-length collective bargaining. *Cf. ICTSI*, 15 F.Supp.3d at 1094 (finding this element satisfied with respect to the PCLCD on a motion to dismiss because plaintiffs did not challenge this element in their complaint and because the complaint conceded that, "[f]or many years, the ILWU and PMA have negotiated successful collective bargaining agreements").

Accordingly, while it is clear from the allegations in the complaint and judicially noticed facts both that the PCLCD primarily affects only the parties to the agreement and that the PCLCD concerns a mandatory subject of collective bargaining, the Court finds that it is unclear whether the PCLCD is the result of bona fide, arm's-length collective bargaining. Because Defendants must establish that all three of the *Mackey* factors are satisfied for the nonstatutory exemption to apply,

the Court declines to find that the nonstatutory exemption applies at this stage.[12] Nevertheless, should discovery reveal that the PCLCD was the result of arm's-length collective bargaining, Defendants may raise this issue on a motion for summary judgment.

### 3. Attempted Monopoly

Next, Defendants also argue that Plaintiffs' claims of Defendants' attempted monopoly in the relevant market are deficient. (Mot. at 18–20.) The Sherman Act prohibits monopolies and attempts to form monopolies. 15 U.S.C. § 2 ("Every person who shall monopolize, or attempt to monopolize, or conspire with any other persons, to monopolize any part of the trade or commerce ... [commits a felony]."). To prevail on a claim of attempted monopoly, Plaintiffs must establish "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust injury." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (quoting *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir.1988)). This fourth element requires that plaintiffs only be compensated for "injuries that the antitrust laws were intended to protect." *Id.*

Defendants argue primarily that Plaintiffs have failed to state a claim for monopoly or attempted monopoly because their allegations in the SAC are insufficient and because the PCLCD operates pursuant to federal labor policy. (*See* Mot. at 18–20.) In the SAC, Plaintiffs allege that Defendants, through operation

---

**12.** To the extent this ruling is inconsistent with the Court's analysis in a previous order, the Court hereby reconsiders its prior holding. *See City of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 886 (9th Cir.2001) ("A district court ... retains jurisdiction over an interlocutory order—and thus may reconsider, rescind, or modify such an order—until a court of appeals grants a party permission to appeal.").

of the PCLCD, have attempted to monopolize the relevant work in the relevant market area. (*See, e.g.,* SAC ¶¶ 44, 51, 58, 90, 104, 106, 108, 116, 121.) Although Defendants argue that Plaintiffs' claim is "subject to dismissal" because the SAC contains insufficient facts to support such a claim for attempted monopoly, Defendants do not specifically identify the alleged deficiencies. Accordingly, it remains unclear whether Plaintiffs have stated a viable claim for attempted monopoly. Defendants' motion is therefore **DENIED** as to Plaintiffs' claim for attempted monopoly at this stage.

### C. Breach of Contract

■ Finally, Defendants address Plaintiffs' breach of contract claim by Iron Workers, in which Plaintiffs allege that ILWU breached Article XX of the AFF–CIO Constitution. It is undisputed that Iron Workers is affiliated with the AFF–CIO and that the ILWU *was* party to the AFF–CIO Constitution until September 2013 when they withdrew. (SAC ¶¶ 131, 140.) Iron Workers now claims that the ILWU breached section 3 of Article XX of the AFF–CIO Constitution, which states: "Each affiliate shall respect the established work relationship of every other affiliate.... No affiliate shall by agreement or collusion with any employer or by the exercise of economic pressure, seek to obtain work for its members as to which an established work relationship exists with any other affiliate except with the consent of such affiliate." (SAC ¶ 133.)

Defendants argue that the SAC once again fails to state a claim for breach of the AFL–CIO Constitution. By its terms, Article XX prohibits signatories to the Constitution from interfering with the "established work relationship" of other signatories, which is deemed to exist with regard to any work that is "customarily performed at a particular plant or worksite." (SAC ¶ 133.) According to Defen-

dants, the SAC fails to state a breach of this provision because Plaintiffs have failed to allege facts from which the Court may infer the existence of any "established work relationship" with which Defendants interfered within the meaning of Article XX.

In dismissing this cause of action in Plaintiffs' initial Complaint for failure to state a claim, the Court observed that while "[t]he Complaint [wa]s replete with allegations that Plaintiffs historically performed *this type of work,*" Plaintiffs had failed to "allege that they customarily performed it at the sites in question so as to demonstrate the 'established work relationship' that Article XX seeks to protect." (Dkt. No. 40 at 23.) Plaintiffs then alleged in the First Amended Complaint that "[t]he International Association and its members have customarily performed the relevant work at the port facilities described in the relevant market area set forth." (First Am. Compl. ¶ 116.) Again finding Plaintiffs' allegations inadequate, the Court noted that the mere addition of the word "customarily," unsupported by additional facts, does not demonstrate that Plaintiffs actually customarily performed work at the sites in questions so as to demonstrate the "established work relationship" that Article XX seeks to protect.

Plaintiffs have now amended their complaint again, in which they allege that: "For at least twenty (20) years prior to 2008, the relevant work was exclusively performed by the International Association at the ports in the relevant market area. Neither the Longshoremen, nor any other non-iron Worker union or affiliate of the AFL–CIO performed this work at these ports." (SAC ¶ 135.) Plaintiffs further allege that, "[a]t each of these ports, the International Association performed at least ten (10) projects, and in some cases, more than one hundred (100) projects con-

sisting of relevant work prior to 2008." (SAC ¶ 136.) As Defendants argue, however, alleging that a plaintiff has a history of performing work "at the *ports* in the relevant market area" is not equivalent to alleging a history of performing work "at a particular plant or work site" located within those ports. Accordingly, these amendments fail to cure the deficiencies in Plaintiffs' breach of contract claim identified by the Court in its prior orders.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion is **GRANTED in part** and **DENIED in part.** Plaintiffs' first cause of action is **DISMISSED** as it relates to the Union Plaintiffs for lack of standing, and Plaintiffs' second and third causes of action are **DISMISSED** as to all Plaintiffs for failure to state a claim. This is the third time that the Court has dismissed Plaintiffs' first cause of action with respect to the Union Plaintiffs and Plaintiffs' second and third causes of action with respect to all Plaintiffs. (*See* Dkt. Nos. 40, 46.) Accordingly, Plaintiffs' second and third claims are hereby **DISMISSED with prejudice,** as is Plaintiffs' first cause of action with respect to the Union Plaintiffs. *See Desaigoudar v. Meyercord,* 223 F.3d 1020, 1026 (9th Cir.2000) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." (quoting *Allen v. City of Beverly Hills,* 911 F.2d 367, 373 (9th Cir.1990))). Defendants' motion is **DENIED** as it relates to Plaintiffs' first cause of action brought by the Employer Plaintiffs.

The hearing set for June 22, 2015 is **VACATED.**

**IT IS SO ORDERED.**