**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMERICAN PRESIDENT LINES, LTD., *Plaintiff-Appellant*, | No. 11-36080 |
| | D.C. No. 3:10-cv-00183-JWS |
| v. | |
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, ALASKA LONGSHORE DIVISION, UNIT 60, *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted
May 21, 2013—Anchorage, Alaska

Filed July 12, 2013

Before: A. Wallace Tashima, Richard C. Tallman,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Tallman

## SUMMARY[*]

### Labor Law

The panel reversed the district court's dismissal for lack of statutory standing of an employer's action seeking damages under § 303 of the Labor Management Relations Act for unfair labor practices allegedly committed by a union at arbitration in violation of § 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act, and remanded.

The panel held that, even though the employer did not exhaust a petition to vacate the arbitration award under § 301 of the Act, nothing in § 303 precluded the employer's action for damages. The panel held that, whether it considered the employer as either a neutral or primary employer, the employer sufficiently alleged that it had suffered damages by reason of the union's alleged unfair labor practices. The panel held that the employer had satisfied every statutory requirement to establish standing under § 303.

### COUNSEL

Philip L. Ross (argued), Littler Mendelson, P.C., San Francisco, California; Douglas S. Parker, Littler Mendelson, P.C., Anchorage, Alaska, for Plaintiff-Appellant.

Robert S. Remar (argued), Eleanor I. Morton, and Emily M. Maglio, Leonard Carder, LLP, San Francisco, California, for Defendant-Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

TALLMAN, Circuit Judge:

Section 303 of the Labor Management Relations Act[1] ("LMRA") provides a judicial forum to pursue damages resulting from certain unfair labor practices[2] committed by a

---

[1] Section 303 provides:

> (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

> (b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

29 U.S.C. § 187.

[2] Section 8(b)(4)(ii) of the National Labor Relations Act ("NLRA") provides that it shall be an unfair labor practice for a union to:

> threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

> (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to

union.  In rare cases, the union can commit a predicate unfair labor practice through its conduct in an arbitration proceeding.  The plaintiff employer's claim requires us to resolve whether Section 303 permits an action challenging the union's conduct at the arbitration when the plaintiff has admittedly failed to challenge the arbitration award itself in court under Section 301 of the LMRA, 29 U.S.C. § 185.

The defendant union maintains that as a matter of policy, the interest in the finality of arbitration proceedings should require plaintiffs in these rare cases to first exhaust a petition to vacate the arbitration award before they can claim Section 303's remedy.  But in the face of a statutory right to pursue damages, we cannot place additional obstacles to enforcing that right without congressional authorization.  Because nothing in Section 303 precludes this action, even without exhausting a petition to vacate, we reverse the district court's dismissal for lack of statutory standing.

---

enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees . . . .

29 U.S.C. § 158(b)(4)(ii).

# I

## A

This case places the courts in the middle of a long-standing dispute between plaintiff American President Lines, Ltd. ("APL"), and the defendant, the International Longshore and Warehouse Union ("the ILWU"), over who may claim certain longshore work handling cargo at the Port of Seward, Alaska.

APL operates ocean-going container ships and marine terminals involved in transporting cargo throughout the world, including in and out of Alaska. The ILWU represents longshore workers in specified Alaskan ports, including the Port of Seward on the Alaskan mainland. APL and one other steamship operator, Horizon Lines, form the multi-employer bargaining group called the Alaska Maritime Employers Association ("AMEA"), which is a signatory to the All Alaska Longshore Agreement ("AALA"). The AALA is a collective bargaining agreement covering dockside activity directed by the employers that applies to all ILWU longshore workers in all covered ports in Alaska.

Under the AALA, APL has traditionally used ILWU-represented longshore workers in Dutch Harbor, APL's deep water port at the tip of the Aleutian Islands and its main Alaskan cargo handling location. Because of their size, APL's deep draft, ocean-going cargo vessels cannot call at small ports in remote areas of Alaska, and APL does not own or operate in Alaska its own tender vessels, such as barges, that can operate in these ports. So APL enters into connecting carrier agreements with local barge operators to bring export product, usually containers of frozen fish, for

APL customers from Alaskan mainland ports to the Dutch Harbor terminal.

This dispute was triggered by a separate carrier agreement with a barge company, Samson Tug & Barge, which operates out of Seward. In 2004, APL contracted with Samson to move APL containers between Seward and Dutch Harbor. Under the agreement, APL employed ILWU longshore workers to load empty cargo containers onto Samson barges in Dutch Harbor. When the barges reach Seward the containers are off-loaded onto Seward's public dock. APL's customers then fill the empty containers with their product. Once filled, the containers are loaded back onto Samson's barges, which then transport the product back to Dutch Harbor—where they are off-loaded by ILWU-represented longshore workers and onto APL's container ships.

The crux of the dispute is that Samson employees—who are not ILWU-represented laborers—perform all of the cargo handling of APL containers in Seward. Samson employees are represented by a different union, the Marine Engineers' Beneficial Association ("MEBA"). The ILWU balked at this arrangement and argued that the AALA requires APL to give the Seward work to members of the ILWU.

The ILWU believed that APL had violated Section 7.641 of the AALA ("the Work Preservation Clause"), which provides:

> In further consideration of the terms and conditions set forth in this Contract, the Employer hereby assures the Union that it will use its best efforts and act in good faith in preserving as much as possible all of the work

covered by this Contract for the registered
work force.

It is undisputed that prior to 2003, the ILWU had performed the same longshore work at Seward for a different employer, North Star Stevedore, when North Star was a signatory to the AALA. The parties dispute, though, whether any of the Seward work previously performed for North Star involved APL containers. *Compare* Appellant's Opening Brief at 13 ("APL first penetrated the Seward market in July 2004.") *with* Appellee's Answering Brief at 8 ("Before 2004 ILWU Alaska Longshore Division-represented longshore workers loaded and discharged APL containers at the Port of Seward . . . for North Star."). MEBA has disclaimed any right to this work.

The ILWU brought a grievance against APL for breach of the collective bargaining agreement, claiming that APL failed to preserve the Seward work for members of the ILWU. At the time, however, a new bargaining agreement was being negotiated, and the parties ultimately came to terms. In a Letter of Understanding incorporated in the renegotiated AALA, APL agreed that it "[p]robably will cease doing business in Seward with Samson."

APL attempted to contract with Horizon Lines, an AMEA member that uses trucks to move cargo from Seward to Anchorage and then transports containers to Dutch Harbor on ships. But Horizon would not agree to take on 100 percent of APL's Seward cargo, so APL continued to use Samson, and its MEBA-represented employees, to handle its Seward customers' containers.

In 2006, the local Seward constituent of the ILWU ("Unit 60") filed a grievance over APL's refusal to have ILWU-

represented workers perform the off-loading and loading of APL containers in Seward. The grievance alleged that the displacement of ILWU longshore workers in Seward violated the AALA.

## B

The AALA has a two-step arbitration procedure for resolving grievances. The grievance first goes before an Alaska Arbitrator. Once the Alaska Arbitrator reaches a final decision, and the award has been implemented, the parties can appeal to the Coast Arbitrator in California for a final determination.

In September 2006, the Alaska Arbitrator conducted the initial arbitration based solely on the parties' written submissions. The arbitrator determined that: (1) "[t]he work in dispute was previously performed by APL using a stevedore signatory to the AALA as required by the agreement prior to the work being performed by Samson employees;" and (2) "APL . . . conditions and controls the hiring of Samson in violation of the agreement with the ILWU." The Alaska Arbitrator ordered APL to assign the Seward work to Unit 60. The Alaska Arbitrator also determined, as a matter of labor law, that the union was not violating Section 8(b)(4) of the National Labor Relations Act by demanding the work.

APL appealed the decision to the Coast Arbitrator, who did not initially rule on the merits. The Coast Arbitrator remanded the matter and instructed the Alaska Arbitrator to hold a full evidentiary hearing and to refrain from making any conclusions regarding the legal impact of its decision. The Coast Arbitrator ruled that the initial Alaska Arbitrator

decision would remain in effect in the interim.  APL never gave the work to the ILWU; instead, it paid "in lieu of" time cards to the ILWU, which essentially pays the union at contract rates for all hours of longshore work performed by Samson employees in Seward.

The Alaska Arbitrator, after a full hearing, then issued a new decision in which he once again required that the ILWU receive APL's Seward longshore work.  He found that: (1) "[t]he work that has historically been performed, now has been agreed is longshore work;" and (2) "[l]oading/discharging containers from Samson barges was work previously performed by the ILWU . . . through a signatory stevedore, North Star."  The arbitrator stated that APL could give the work to ILWU's Unit 60 in several ways, including:  (1) Samson could sign a compliance agreement with the AALA and hire the ILWU directly; (2) APL could have its own stevedore company—which does not currently operate in Alaska—perform the work; or (3) the work could be done using a company that will work with the ILWU in Seward.  "Obviously this is an Employer decision," the Alaska Arbitrator wrote, "but in any event, [ILWU] longshore personnel must perform the work."  The arbitrator ordered APL to give the work to Unit 60, and in the interim pay "in lieu of" time cards for longshore work Samson performed with APL containers.

APL refused to give the work to the ILWU, contending that the arbitrator's interpretation of the Work Preservation Clause rendered it a "hot cargo" agreement[3] prohibited by

---

[3] A "hot cargo" agreement exists when a union and employer agree to have the employer cease handling the goods of another or cease doing

Section 8(e) of the NLRA.[4]  So APL continued to pay "in lieu of" time cards.  It attempted to appeal again to the Coast Arbitrator.  The ILWU, though, objected and claimed that the Alaska Arbitrator's decision would not be "implemented"— as required for an appeal—until APL actually gave the Seward work to the ILWU.  The Alaska Arbitrator agreed with the union.

The Coast Arbitrator refused to consider the second appeal: "[T]he Alaska Arbitrator's determination concerning implementation of assigning the work in question to the ILWU, rendered as part of his retained jurisdiction, is required to be followed as a precondition to appealing his decision in this case."  The Coast Arbitrator refused to comment on the merits and made it clear that APL was free to file an unfair labor practice charge with the National Labor Relations Board if APL believed compliance with the arbitration award would cause it to violate the NLRA.

---

business with any other person.  29 U.S.C. § 158(e).  *See also* 48A Am. Jur. 2d *Labor and Labor Relations* §§ 1813–32.

[4] Section 8(e) provides:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void.

29 U.S.C. § 158(e).

## C

APL proceeded to file its charge with the NLRB alleging that the arbitrator's award violated Section 8(e) of the NLRA, and that the ILWU violated Sections 8(b)(4)(ii)(A) and (B) when it pursued its interpretation of the Work Preservation Clause at arbitration. The NLRB General Counsel's Division of Advice investigated the charges and issued an "Advice Memorandum" advising the NLRB Regional Office in Seattle to dismiss the charges because they lacked merit. The NLRB Regional Office dismissed the charges without an evidentiary hearing, and the Central Office of Appeals denied APL's appeal from that dismissal.

## D

APL then filed this action in the District of Alaska under Section 303 of the LMRA. 29 U.S.C. § 187. It asserted that the ILWU violated Sections 8(b)(4)(ii)(A) and (B) of the NLRA when it advanced an interpretation at arbitration that forced APL to enter into a "hot cargo" agreement and to cease doing business with Samson. It sought reimbursement of the wages it had paid the ILWU through "in lieu of" time cards. The ILWU, in its answer, raised nine different affirmative defenses but never challenged APL's standing. The ILWU then moved for summary judgment on four grounds, none of which challenged APL's standing. The district court, though, *sua sponte* ordered the parties to brief whether APL had Article III and Section 303 standing.

After receiving supplemental briefing, the district court held that APL had Article III standing but lacked statutory standing under Section 303(b) because "APL is attempting to litigate issues—whether the Seward work was fairly

claimable by ILWU and whether APL had a right to control that work—that have already been decided through arbitration which the parties agreed would be binding." It continued: "Allowing APL to proceed under § 303 would undermine the national labor policy in favor of arbitration." The lawsuit was dismissed.

APL timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

## II

APL brought this action as the last resort in its struggle to avoid giving its Seward work to the ILWU. It has twice failed to convince an arbitrator that it has no duty under the AALA to give this work to the ILWU; it has failed to convince the NLRB General Counsel that the ILWU's interpretation of the AALA has turned the agreement into a "hot cargo" agreement; and it has also failed to file a timely petition to vacate the arbitration award. But none of these failures deprives APL of standing to bring this action under Section 303.

We think the district court conflated the merits of this case with whether APL has statutory standing. As we read the statute, nothing in Section 303 bars an employer—whether primary or neutral—from seeking compensatory damages for a union's alleged unfair labor practice, even if that practice occurs during arbitration. We reverse and remand so that the district court may consider the merits of APL's claim, however questionable they may be in light of the arbitrator's adverse findings.

## A

Section 303 of the LMRA provides a judicial forum for obtaining financial compensation for a union's commission of an unfair labor practice. *See* 29 U.S.C. § 187. The statute establishes that it "shall be unlawful" for a union "to engage in any activity or conduct defined as an unfair labor practice in" Section 8(b)(4) of the NLRA. *Id.* § 187(a); *see also id.* § 158(b)(4). Then it quite broadly confers standing to "[w]hoever shall be injured in his business or property by reason o[f]"[5] any such unfair labor practice. *Id.* § 187(b).

We have held that Section 303's requirement that an injury occurs "by reason of" a Section 8(b)(4) violation "imposes standing limitations." *Fulton v. Plumbers & Steamfitters*, 695 F.2d 402, 405 (9th Cir. 1982). In *Fulton*, we held that a court must determine whether Section 303 standing exists by looking to: (1) the nexus between the injury and the statutory violation; and (2) the relationship between the injury alleged and the forms of injury that Congress sought to prevent or remedy by enacting the statute. *Id.* To determine the relationship between the injury and the statutory violation, we examine whether the plaintiff "was within the target area of the defendant's illegal practices and was not only hit, but also aimed at." *Id.* at 406 (citation and internal quotation marks omitted).

The nature of APL's two alleged statutory violations and the alleged injury are important to this inquiry. Under Section 8(b)(4)(ii)(A), a union may not force or require an employer to enter into a "hot cargo" agreement prohibited by

---

[5] Because of a typographical error, the statute actually reads "by reason or." 29 U.S.C.A. § 187 n.1.

Section 8(e). *See* 29 U.S.C. §§ 158(b)(4), 158(e). A "union signatory" clause, which prohibits the employer from subcontracting with all employers who are not union signatories, is one such agreement. *NLRB v. Hotel & Rest. Emps. & Bartenders' Union*, 623 F.2d 61, 67 (9th Cir. 1980) ("[I]t is well settled that union signatory clauses violate section 8(e)."). APL posits that the ILWU's interpretation of the AALA, accepted by the arbitrator, makes the Work Preservation Clause a "hot cargo" agreement because APL may only work in Seward with subcontractors who are signatories to the AALA.

Second, under Section 8(b)(4)(ii)(B), a union may not force an employer to cease doing business with other entities who do not employ the union's members. Under this section, the union may seek to preserve "fairly claimable" work that the employer has a "right to control," but it may not exert its influence to acquire new work. APL argues that the ILWU's interpretation of the AALA, accepted by the arbitrator, forces APL to cease doing business with Samson—which does not use ILWU labor in Seward—without a valid work preservation justification.

Because the arbitrator adopted the ILWU's interpretation of the AALA at arbitration, APL has paid "in lieu of" time cards for the work Samson's MEBA employees have performed for APL. Therefore, this financial injury is directly tied to the nature of the alleged statutory violations.

APL has framed its complaint to position itself as a neutral employer—which is to say that APL views the ILWU's dispute as primarily with Samson regarding the Seward work. The law establishes that even neutral employers have statutory standing to sue a union for alleged

violations of Section 8(b)(4). *See Charvet v. Int'l Longshoremen's Ass'n*, 736 F.2d 1572, 1576 (D.C. Cir. 1984) (citing *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212 (1982)).

But even if we were to categorize APL as a primary employer—recognizing that the ILWU's dispute lies primarily with APL— "it is generally understood that an action under section 303(b) may be brought . . . by the primary employer as well. Primary employers have standing to sue under section 303(b) because they are the direct objects of the union's unlawful activity." *Charvet*, 736 F.2d at 1576 (citing *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839*, 523 F.3d 1371, 1375 n.5 (9th Cir. 1975)). Because Section 8(b)(4) imposes a duty on an employer to resist agreeing to "hot cargo" agreements, "[i]t is consistent with congressional purposes, and only fair, that an employer injured as a result of such obligatory resistance in the face of coercion prohibited by section 8(b)(4)(ii)(A) should have a remedy under section 303." *Mead*, 523 F.2d at 1375–76. There is no question that the ILWU has directed its activities during arbitration at APL, the only other party to that proceeding.

Therefore, whether we consider APL as either a neutral or primary employer, we conclude that it has sufficiently alleged that it has suffered damages "by reason of" the ILWU's alleged unfair labor practices. We hold that APL has satisfied every statutory requirement to establish standing under Section 303.

**B**

We are left to determine whether APL's failure to file a petition to vacate the Alaska Arbitrator's award should have any effect on its ability to bring this Section 303 action challenging the union's conduct at that arbitration. The district court believed so, but we disagree.

"Ordinarily, a party opposing an arbitration award must move to vacate the award or be barred from further legal action." *Sheet Metal Workers' Int'l Ass'n, Local No. 252 v. Standard Sheet Metal, Inc.*, 699 F.2d 481, 482 (9th Cir. 1982). Federal circuit courts have repeatedly dismissed attempts to undermine an arbitrator's award if the moving party failed to file a petition to vacate. In *Sheet Metal Workers* and in *Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70 v. Celotex Corp.*, 708 F.2d 488, 490 (9th Cir. 1983), we refused to allow parties who failed to file a Section 301 petition to vacate to later appeal judicial confirmation of an arbitration award. We have adopted this rule under the power Congress has given the federal courts to fashion common law under Section 301 of the LMRA, which governs collective bargaining agreements. *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 ("[T]he substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws.").

The ILWU seeks to graft this general rule—that a failure to file a petition to vacate precludes any legal contest of the award—on to only those Section 303 suits involving union conduct in an arbitration proceeding. Such a rule would effectively require a plaintiff, in these rare situations, to

exhaust a Section 301 petition to vacate before the plaintiff may file a Section 303 claim.

This rule, though, misunderstands the congressional intent behind Section 303—which is simply to provide a judicial forum for plaintiffs to recover the damages a union has caused them through certain unfair labor practices that are delineated in Section 8(b)(4) of the NLRA. Importantly, the Section 8(b)(4) violations that serve as the premise for Section 303 liability focus on the union's conduct, not the result it obtains. The NLRB has repeatedly confirmed that a union can violate Section 8(b)(4) by advancing an improper interpretation of a contractual clause at arbitration. *See N.Y. Post*, 337 NLRB 608; *Long Elevator*, 289 NLRB 1095. The Section 8(b)(4) violation occurs the moment the union pursues arbitration with an unlawful secondary motive—in this case, by allegedly attempting to force APL to subcontract with only those employers who will hire ILWU labor—not if or when the union succeeds in persuading the arbitrator to sustain its grievance.

APL challenges the union's actions, not the arbitrator's decision.[6] The arbitration award itself is only relevant in this

---

[6] It is for this same reason we reject the ILWU's attempt to apply the six-month statute of limitations for a petition to vacate to this lawsuit. Success on the Section 303 suit may have the collateral effect of undermining the arbitration, but the action is targeted at the union's conduct, not the award itself. We see no reason to upend our consistent practice of applying the statute of limitations for actions "upon a liability created by statute" to Section 303 suits. *See Hyatt Chalet Motels, Inc. v. Carpenters Local 1065*, 430 F.2d 1119, 1121 (9th Cir. 1970). In Alaska, the limitations period is two years. *See* Alaska Stat. § 09.10.070(a) ("[A] person may not bring an action . . . upon a liability created by statute . . .

case to prove that the union's conduct actually caused APL's damages. Although this lawsuit could effectively undermine the arbitrator's award, this would only occur because the union itself allegedly committed an unfair labor practice in obtaining the award.

The ILWU essentially proposes that we fashion a rule that would place an additional obstacle to Section 303 relief on a small segment of plaintiffs, those who: (1) suffered damages because of an alleged Section 8(b)(4) violation that occurred during an arbitration; (2) lost the arbitration; and (3) failed to file a petition to vacate that arbitration. It must propose such a narrow rule because it knows that a union's conduct at arbitration can have an effect on other employers who may well be injured—such as Samson in this case—but who have no role in the arbitration proceeding and therefore cannot petition to vacate the award. The ILWU has proffered no statutory language or legislative history that would suggest Congress intended to so finely parse out those who could invoke Section 303's remedy. When Congress provides a plaintiff with a right of action, we are not free to place additional impediments to exercising that right of action without congressional instruction. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) ("We start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law.").

It may seem unfair to allow APL an opportunity to essentially render toothless an arbitration award it failed to petition to vacate. But the NLRB, under the power Congress

unless the action is commenced within two years of the accrual of the cause of action.").

gave it, has interpreted Section 8(b)(4) to prohibit certain conduct during an arbitration, and Congress has provided employers like APL with the Section 303 remedy for damages caused by Section 8(b)(4) violations arising from union misconduct in such proceedings.  In these atypical Section 303 cases involving arbitrations, we reject an exhaustion requirement that would frustrate that congressional intent.

## C

We readily dispatch any notion that the NLRB General Counsel's dismissal of APL's unfair labor practices charge precludes APL's Section 303 suit.  It has long been the case that a Section 303 lawsuit and the pursuit of administrative enforcement of Section 8(b)(4) coexist as independent avenues for a party wronged by a union's unfair labor practices.  *Int'l Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.*, 342 U.S. 237, 243–44 (1952).  "[A]ction under section 303" is "not dependent on prior administrative determinations."  *Plumbers & Fitters, Local 671 v. Matt J. Zaich Constr. Co.*, 418 F.2d 1054, 1056 (9th Cir. 1969) (citing *Juneau Spruce*, 342 U.S. 237).

Although some courts have applied collateral estoppel to issues the NLRB has decided in a fully litigated enforcement proceeding, *see, e.g.*, *Wickham Contracting Co. v. Bd. of Educ.*, 715 F.2d 21 (2d Cir. 1983), the federal courts have unanimously held that the mere dismissal of a charge by the General Counsel does not preclude a Section 303 action.  *See Peltzman v. Central Gulf Lines, Inc.*, 497 F.2d 332, 334–35 (2d Cir. 1974) ("[T]he decision of the General Counsel not to file a complaint on [the plaintiff's] behalf has no *res judicata* effect, as it is not a final judgment on the merits."); *Aircraft*

*& Engine Maintenance & Overhaul, Bldg., Constr., Mfg., Processing & Distrib. v. I.E. Schilling Co.*, 340 F.2d 286, 289 (5th Cir. 1965) ("Surely, the mere refusal by the general counsel to issue a complaint is not *res judicata* and can not constitute a collateral estoppel.").

We will not belabor the point. Although the district court may find the NLRB's reasoning persuasive when considering APL's Section 303 claim on the merits, the General Counsel's mere dismissal of a charge—without even a formal hearing—does not preclude this suit.

## III

Conceding without contesting that APL has standing, the ILWU nonetheless implores us to affirm the district court's dismissal on the merits. We decline their request.

"It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Whether APL's claim may survive summary judgment on its merits remains "an issue not passed upon below." *Id.*; *see also Dodd v. Hood River County*, 59 F.3d 852, 863–64 (9th Cir. 1995) (refusing to consider the merits after reversing the district court's dismissal for lack of ripeness). The ILWU suggests that even though the district court phrased its dismissal order in terms of standing, the court in reality considered and dismissed the case on the merits. The district court's order, though, clearly stated that "APL's claim is DISMISSED for lack of standing

to proceed under Section 303(b)."[7]  It is clear that the district court did not consider its judgment to be on the merits.

APL showed the requisite standing to bring its timely action.  We remand to the district court so that it may properly consider APL's claim on the merits.  On remand, the district court must address both of the unfair labor practices alleged by APL and determine whether:  (1) the ILWU violated Section 8(b)(4), and (2) if so, whether the union's conduct caused APL's alleged damages.

## IV

APL has alleged that the ILWU committed an unfair labor practice, targeted directly at APL, during the arbitration of their dispute concerning longshore work at the Port of Seward.  APL was not required to exhaust a petition to vacate the arbitration award to establish standing under Section 303.  Absent clear congressional intent, we will not erect new obstacles to pursuing damages under Section 303.

The district court's judgment is **VACATED**, and the case is **REMANDED** so that the district court may consider the merits of APL's claim.  Each party shall bear its own costs.

---

[7] If the district court believed that the Alaska Arbitrator's decision had already determined the legal issues in this case, it did so erroneously.  As the Coast Arbitrator correctly noted, the Alaska Arbitrator was only permitted by the AALA to make findings of fact.  It is up to the district court to determine whether to defer to or uphold those findings and, if it does, what effect those factual findings have on APL's legal arguments.