**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AMERICAN FEDERATION OF
MUSICIANS OF THE UNITED
STATES AND CANADA,
　　　　　*Plaintiff-Appellant*,

v.

PARAMOUNT PICTURES
CORPORATION,
　　　　　*Defendant-Appellee.*

No. 16-55996

D.C. No.
CV 15-4302 DMG

OPINION

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted February 8, 2018
San Francisco, California

Filed September 10, 2018

Before: A. Wallace Tashima, Marsha S. Berzon,
and Morgan Christen, Circuit Judges.

Opinion by Judge Tashima

# SUMMARY[*]

## Labor Law

The panel reversed the district court's grant of summary judgment in favor of defendant Paramount Pictures Corp. in an action brought under § 301 of the Labor Management Relations Act, alleging breach of a collective bargaining agreement in connection with the motion picture *Same Kind of Different As Me*, which was scored in Slovakia.

The American Federation of Musicians of the United States and Canada, a bargaining representative for musicians, alleged breach of Article 3 of the Basic Theatrical Motion Picture Agreement of 2010, which required signatory movie studios to score domestically, with AFM musicians, any motion picture that the studios produced domestically. Paramount contended that Article 3 did not apply because it did not produce *SKODAM*.

The panel held that the district court misinterpreted Article 3 to apply only if a signatory producer employed the cast and crew shooting the picture. The panel concluded that the Basic Agreement was a labor agreement involving scoring musicians, and Article 3 functioned as a work preservation provision that dictated when a signatory has to hire those musicians. Therefore, Article 3 applied when a signatory studio produced a motion picture and had authority over the hiring and employment of scoring musicians. Whether a studio also employed the cast and crew was not relevant to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Article 3.  The panel held that, on the summary judgment record, it was a disputed question of fact whether Paramount produced *SKODAM* and had sufficient authority over the hiring of scoring musicians such that Article 3 applied.

The panel rejected Paramount's affirmative defense that Article 3 violated the National Labor Relations Act's "hot cargo" provision, which prohibits an employer from entering into an agreement to cease or refrain from dealing in the products of another employer or to cease doing business with any other person.  Paramount asserted that AFM's suit to enforce Article 3 violated the hot cargo provision because AFM's tactical objective was to force SKODAM Films, a neutral employer, to employ AFM musicians.  The panel held that the hot cargo provision does not apply to valid work preservation agreements.  The panel's conclusion that there was a genuine dispute of material fact whether Paramount had authority over the hiring and employment of scoring musicians prevented summary judgment on the hot cargo defense.

Reversing two of the district court's evidentiary rulings, the panel held that the district court abused its discretion in excluding an expert report and an internal Paramount email.

The panel remanded the case for further proceedings.

**COUNSEL**

Robert Alexander (argued), Jeffrey R. Freund, Abigail V. Carter, and Adam Bellotti, Bredhoff & Kaiser PLLC, Washington, D.C., for Plaintiff-Appellant.

Adam Levin (argued), Emma Luevano, and Emily F. Evitt, Mitchell Silberberg & Knupp LLP, Los Angeles, California, for Defendant-Appellee.

**OPINION**

TASHIMA, Circuit Judge:

Since at least 1946, major motion picture studios and the musicians, conductors, and orchestras who score motion pictures have agreed to a series of collective bargaining agreements governing the musicians' hiring, wages, and work conditions when they score a motion picture for a signatory studio. This case concerns whether Paramount Pictures breached a recent vintage of those agreements, the Basic Theatrical Motion Picture Agreement of 2010 ("Basic Agreement"). The musicians' bargaining representative, the American Federation of Musicians of the United States and Canada ("AFM"), sued Paramount – a signatory to the Basic Agreement – after the motion picture *Same Kind of Different As Me* ("*SKODAM*") was scored in Slovakia. AFM alleged that Paramount breached its obligation under Article 3 of the Basic Agreement to score domestically, with AFM musicians, any motion picture that it produces domestically. Paramount moved for summary judgment, contending that Article 3 did not apply because Paramount did not produce *SKODAM*.

The district court granted the motion. First, the court concluded that a studio produces a motion picture when the studio "makes" or "shoots" the principal photography. Second, the court concluded that under Article 3, a signatory studio that "produces" a motion picture has to score a motion picture domestically only when it employs the cast and crew shooting the picture. Because there was no evidence that Paramount employed anyone shooting the picture, the court concluded that as a matter of law, Paramount did not breach the Basic Agreement.

We reverse. The district court misinterpreted Article 3 to apply only if a signatory Producer employs the cast and crew shooting the picture. The Basic Agreement is a labor agreement involving scoring musicians, and Article 3 functions as a work preservation provision that dictates when a signatory has to hire those musicians. Therefore, Article 3 applies when a signatory studio produces a motion picture and has authority over the hiring and employment of scoring musicians. Whether a studio also employs the cast and crew is not relevant to Article 3. On the summary judgment record, it is a disputed question of fact whether Paramount produced *SKODAM* and had sufficient authority over the hiring of scoring musicians such that Article 3 applied. We also reject Paramount's affirmative defense that Article 3 violates the National Labor Relation Act's ("NLRA") "hot cargo" prohibition, and reverse two of the district court's evidentiary rulings.

## BACKGROUND

## I.  Factual Background

AFM is a labor union that represents approximately 80,000 professional musicians in the United States and Canada, including those who score motion pictures.  The "scoring" of motion pictures refers both to the recording of music sound track for motion pictures and music preparation work, such as copying and orchestration.[1]  Scoring musicians are not salaried employees of individual production studios; instead, musicians score motion pictures on a per-picture basis.  The studios usually arrange for the employment of scoring musicians indirectly.  In a "fee deal" arrangement, the studio hires a music contractor, who hires the musicians.  In a "package deal" arrangement, the studio hires the composer and provides him or her a lump sum to hire the musicians, which the composer usually does through a music contractor.

### A.  The Basic Agreement

For decades, AFM has negotiated a series of collective bargaining agreements with major motion picture studios, represented in negotiations by the Alliance of Motion Picture and Television Producers ("AMPTP").  Paramount has been party to the agreements since at least 1964.  At the time of *SKODAM*'s production, the collective bargaining agreement at issue in this lawsuit – the Basic Agreement – was in effect.

---

[1] As defined in the Basic Agreement, orchestration is "the art of assigning, by writing in the form of an orchestra score, the various voices of an already written composition complete in form."

The Basic Agreement enumerates wage, benefits, and working conditions requirements for AFM musicians hired to score motion pictures. For example, the Basic Agreement establishes when musicians receive days off, requires the signatory Producers[2] to pay into a musician health plan, and establishes wage scales for various covered employees. Article 1 of the Basic Agreement, titled "Scope of Agreement," provides:

> This Agreement shall be applicable to the classifications of employees listed in the "Wage Scales, Hours of Employment and Working Conditions" attached hereto, and also to all conductors, featured instrumental musicians and orchestras, employed by the Producer in the State of California or elsewhere in the United States and Canada and whose services are rendered in connection with the production of theatrical motion pictures.

Article 3 of the Basic Agreement – the provision central to this case – provides: "All theatrical motion pictures produced by the Producer in the United States or Canada, if scored, shall be scored in the United States or Canada." Article 3 has been in the Basic Agreement for at least 50 years and has been a point of contention in negotiations.

---

[2] The signatory studios are referred to throughout the Basic Agreement as "Producers." To be clear: the term "Producer" is distinct from the term "produced" in Article 3. Thus, it is not the case that a Producer – a signatory – "produces" within the meaning of Article 3 anytime a Producer is involved with a motion picture. When a Producer "produces" is disputed, but the parties do not dispute that Paramount is a "Producer" as a signatory to the Basic Agreement.

**B.  *Same Kind of Different As Me***

The instant dispute arises from the making of the motion picture *Same Kind of Different As Me*.  Ron Hall, who had authored a book of the same title, developed the *SKODAM* screenplay along with Alex Foard and Michael Carney, who would become the picture's director.   In 2014, the screenwriters and Darren Moorman formed SKODAM Films, LLC, in order to produce *SKODAM*.  Moorman raised money and reached out to potential partners, including Disruption Entertainment ("Disruption"), which was run by individual producer Mary Parent.  Parent showed interest in *SKODAM* and told Moorman that she would ask Paramount for its response to the project.

1.  *Paramount and Disruption Memorandum of Agreement*

At the time that SKODAM Films approached Disruption, Paramount and Disruption had a Memorandum of Agreement ("MOA") related to Parent's producing services.  The MOA was a "first look" agreement that required Parent to share with Paramount any motion picture projects under her control or that she was considering acquiring, so that Paramount could determine whether to produce the motion picture.  The MOA provided, "It is the essence of this Agreement that during the Term, [Disruption's] producing services in connection with theatrical motion pictures shall be exclusive to [Paramount]."  If Paramount passed on a project, Parent could shop that project to other  motion picture studios.  In exchange, Paramount paid Disruption an overhead contribution toward expenses and staff salaries and paid Parent a per-picture producing fee. Disruption employees also kept office space at Paramount and had Paramount email

addresses. During the term of the MOA, Parent worked on several motion pictures with Paramount and several with other studios.

After Parent's conversation with Moorman, Disruption contacted Paramount in the summer 2014. Paramount executives commented on two versions of the *SKODAM* script and projected the motion picture's potential revenue. Paramount also met with Carney and eventually decided to become involved with *SKODAM*.

### 2. *Co-Financing and Distribution Agreement*

On October 16, 2014, Paramount and SKODAM Films executed a "Co-Financing and Distribution Agreement." The Co-Financing and Distribution Agreement referred to SKODAM Films as "Producer" and Paramount as "Paramount" and established the parties' respective obligations in connection with "the production, distribution, and co-financing" of *SKODAM*. Paramount committed to finance 40% of *SKODAM*'s production and budget, while SKODAM Films would contribute 60%. Paramount received the exclusive right to distribute the picture and the soundtrack, and a 40% copyright to "reflect[] the status of Paramount and Producer as co-authors and co-owners of the work." Paramount also received a presentation credit – "Paramount Pictures presents" – on the motion picture, while Parent and the individual members of SKODAM Films received "producer" credits.

The Co-Financing and Distribution Agreement included several conditions precedent to Paramount's performance, two relevant to this case. First, SKODAM Films was required to contract with Disruption for Parent's producing

services. Second, Paramount had to approve "the screenplay and the budget prepared by [SKODAM Films]," the director, and lead cast members. SKODAM Films could not begin principal photography until Paramount gave the latter two approvals.

### 3. *SKODAM Films and Disruption Agreement*

In satisfaction of the first condition precedent in the Co-Financing and Distribution Agreement, SKODAM Films executed an agreement with Dreamchaser, Inc. – an entity associated with Disruption and Parent – for Parent's producing services. SKODAM Films gave Parent the right to "mutually approve all material creative decisions" in connection with *SKODAM*. The agreement further provided that if Parent and SKODAM Films disagreed about those material creative decisions, "[Paramount's] decision shall control."

### 4. *Principal Photography on SKODAM*

With the foregoing agreements in place, principal photography for *SKODAM* took place in Jackson, Mississippi, between October and December 2014. Moorman selected the shooting dates and locations, and spent "hundreds of hours" arranging the shooting of every scene. SKODAM Films, via Moorman, also negotiated agreements with labor unions like the Directors Guild of America and SAG-AFTRA. Although they were not on site during principal photography, multiple Paramount employees received and reviewed dailies – the daily film output – from SKODAM Films. One Paramount executive gave the *SKODAM* director suggestions relating to the "pace" of shooting, as well as feedback on a few specific scenes and

one actor's performance. At Paramount's behest, SKODAM Films consulted with a production professional prior to an aerial shoot in Texas.

AFM learned about *SKODAM* and, in December 2014, sent Paramount a letter stating that the union's musicians "look[ed] forward to the scoring" of *SKODAM* as the picture entered post-production.[3] "Post-production" refers to activities occurring after the motion picture has been shot, such as editing and scoring. Nothing in the record indicates that Paramount responded to AFM's letter.

### 5.  *Composer Agreement*

In February 2015, after principal photography had concluded, composer John Paesano contracted with SKODAM Films to score *SKODAM* (the "Composer Agreement"). The *SKODAM* director, Carney, selected Paesano. In the Composer Agreement, Paesano warranted that the *SKODAM* score would not be subject to the "jurisdiction of any labor organization (e.g., [AFM])." Per the contract, Paesano's composer fee included money to hire musicians, making the arrangement a "package deal." Paramount reviewed and approved the Composer Agreement.

Paesano composed the score between January and April 2015. Around that time, after a test screening of the picture (which did not yet include Paesano's score), Paramount's chief music executive called Paesano to have what the composer described as a "general conversation" about the music for the picture. Once the score was composed, Paesano

---

[3] SKODAM Films is not a signatory to the Basic Agreement and AFM did not send a similar letter to SKODAM Films.

hired a music contractor, who selected the musicians. Paesano chose to record the score in Bratislava, Slovakia, although he monitored the recording remotely from Los Angeles. That same week, Paesano also recorded two music soloists in Los Angeles.

## II.  Procedural Background

### A.  District Court Proceedings

In June 2015, AFM sued Paramount in federal district court for breach of contract under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). AFM's complaint alleged that Paramount breached Article 3 of the Basic Agreement by scoring *SKODAM* in Slovakia. Paramount moved for summary judgment, contending that it had no obligation to score the picture in the United States or Canada because it did not "produce" the picture under the terms of Article 3. Paramount also raised the affirmative defense that AFM's demand letter violated the "hot cargo" provision, § 8(e) of the NLRA, 29 U.S.C. § 158(e).

The district court granted Paramount's motion. First, the court concluded that the term "produced" in Article 3 is ambiguous and that, based on extrinsic evidence, a Producer "produces" a motion picture when it "makes" or "shoots" the principal photography for a motion picture. The court determined that there was a genuine dispute of material fact whether Paramount "produced" *SKODAM* because, although SKODAM Films did the bulk of the work, Paramount paid SKODAM Films during principal photography and reviewed dailies. Second, the district court concluded that Article 3 does not apply every time a signatory Producer produces a motion picture. Looking to Article 1, which establishes that

the Basic Agreement applies only to musicians "employed by the Producer," the court concluded that Article 3 "covers only a Producer of a theatrical motion picture who . . . has the authority to hire and fire employees," like the cast and crew. In addition, the Producer must employ, directly or indirectly, "the employees covered under the [Basic Agreement] during the making and shooting of a motion picture." Because there was no dispute that Paramount did not employ the *SKODAM* cast or crew (SKODAM Films did) or the scoring musicians, Article 3 did not apply. The court thus granted summary judgment for Paramount. The court did not address Paramount's alternative argument that § 8(e), the "hot cargo" provision, bars AFM's suit.[4] This appeal followed.

## B.  Standard of Review

The district court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 185(a), and we have jurisdiction under 28 U.S.C. § 1291. We review de novo both the district court's grant of summary judgment for Paramount and its interpretation of the collective bargaining agreement. *See Alday v. Raytheon Co.*, 693 F.3d 772, 782 (9th Cir. 2012). We review for abuse of discretion the district court's exclusion of evidence from the summary judgment record. *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017).

---

[4] The district court initially issued its order under seal, and issued a redacted order two weeks later. On appeal, the parties filed two versions of their briefs; an unredacted set under seal and a redacted set on the public docket.

## DISCUSSION

## I.  Evidentiary Rulings

First, AFM challenges two of the district court's evidentiary rulings.  Paramount objected to an expert report and an internal Paramount email that AFM included as part of its opposition to Paramount's summary judgment motion. The district court sustained both objections.  In each instance, exclusion was legal error and therefore an abuse of discretion. *See United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009) (en banc).

### A.  Paramount email

AFM challenges the district court's exclusion of an email that Paramount produced in discovery.   In the email, Paramount employee Christina Toth wrote to two other Paramount employees that Neil Kohan, a representative of *SKODAM* composer Paesano, had reached out to discuss "union vs. non union recordings."   Toth – whose email signature indicated that she worked for Randy Spendlove, President of Motion Picture Music at Paramount – asked the recipients if, "[p]er Randy," one of them could call Kohan. AFM sought to introduce the email to show that Kohan reached out to Paramount about which musicians to hire. Paramount objected that the email was not authenticated and was inadmissible hearsay.  The district court sustained the objection, but did not explain its grounds for exclusion. Neither of Paramount's objections withstands scrutiny.

To authenticate evidence, a party must "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  "A party 'need

only make a prima facie showing of authenticity so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. Estrada-Eliverio*, 583 F.3d 669, 673 (9th Cir. 2009) (quoting *United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996)). Paramount contends that AFM's failure to elicit deposition testimony about the email is fatal to its authenticity. However, Paramount itself produced the email, which includes Toth's Paramount email signature and Paramount email address. Given the "contents, substance . . . [and] other distinctive characteristics of the item," Fed. R. Evid. 901(b)(4), plus the fact that it was produced by Paramount in discovery, a reasonable juror could find that the email is what AFM claims it is.

The Toth email is also not inadmissible hearsay. First, Toth's statements in the email are non-hearsay as opposing party statements because the email establishes that Toth sent it in her capacity as a Paramount employee. *See* Fed. R. Evid. 801(d)(2)(D). Second, Kohan's statement to Toth, the second layer of potential hearsay, is not offered for its truth. AFM states that it included the email to show that Kohan called Paramount to inquire about the hiring of scoring musicians, which was relevant to the issues in Paramount's summary judgment motion.[5] For that reason, Kohan's statement is admissible as verbal acts evidence. *See* Fed. R. Evid. 801(c), advisory committee's note. The district court abused its discretion in excluding the Toth email.

---

[5] In its brief and at oral argument, Paramount could not identify how AFM was offering Kohan's statement for its truth. If AFM were offering Kohan's statement to show that he "wanted" to talk about which musicians to hire, the statement would be offered for its truth. But that is not why AFM seeks to include the email.

## B.  Expert Report

The district court also excluded an expert report prepared by Harris Tulchin because "the report itself [was] not submitted under penalty of perjury."  Tulchin signed the report, although not under penalty of perjury.  Attached to Tulchin's expert report was a declaration in which he attested under penalty of perjury that he prepared the report and would testify "consistent with [its] conclusions and opinions."

For purposes of Federal Rule of Civil Procedure 56(c)(4),[6] there is no meaningful distinction between an expert report accompanied by a sworn declaration and an expert report that is itself sworn.  The out-of-circuit cases relied on by the district court, and cited again by Paramount on appeal, are easily distinguishable.  For example, in *Fowle v. C & C Cola, a Div. of ITT-Continental Baking Co.*, 868 F.2d 59 (3d Cir. 1989), only the plaintiff's attorney – not the expert himself – attested to the veracity of the report.  *Id.* at 67.  *See also Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) (excluding unsworn expert report where there was no indication that the expert had attached a sworn declaration).  By contrast, Tulchin swore in a declaration that he would testify in accordance with the report, which satisfies the functional concerns behind Rule 56(c)(4) – that Tulchin is competent to testify to the conclusions and opinions in the report.  The district court thus abused its discretion by excluding Tulchin's expert report on the basis that the report itself was not signed under penalty of perjury.

---

[6] "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

## II.  Interpretation of the Basic Agreement

Second, AFM challenges the district court's interpretation of Article 3 of the Basic Agreement.  Article 3 provides:  "All theatrical motion pictures produced by the Producer in the United States or Canada, if scored, shall be scored in the United States or Canada."  The parties dispute what it means for a motion picture to have been "produced by the Producer."  The district court concluded that a Producer "produces" a motion picture under Article 3 when it shoots the principal photography and employs the cast and crew.  The district court erred to the extent that it interpreted Article 3 to apply only if a Producer employs the cast and crew working on a motion picture.  As we explain below, the text and structure of the Basic Agreement dictate that Article 3 applies if a Producer produces a motion picture and has authority over the hiring and employment of scoring musicians.

Federal courts "interpret collective-bargaining agreements . . . according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy."  *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015); *see also CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 763 (2018).  "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Tackett*, 135 S. Ct. at 933 (quoting 11 Richard A. Lord, *Williston on Contracts* § 30:6, at 108 (4th ed. 2012)).  "In so doing, we interpret written terms in the context of the entire agreement's language, structure, and stated purpose." *Alday*, 693 F.3d at 782 (alterations, citation, and internal quotation marks omitted).  A contract term is ambiguous only if "multiple reasonable interpretations exist."  *Trs. of S. Cal.*

*IBEW-NECA Pension Tr. Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir. 2008). If a term is ambiguous, the court may look to extrinsic evidence to determine the parties' intentions. *Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Tr. Fund v. Conquer Cartage Co.* (*"Ariz. Laborers"*), 753 F.2d 1512, 1517–18 (9th Cir. 1985); *see also CNH Indus. N.V.*, 138 S. Ct. at 765. Extrinsic evidence includes, "for example, the parties' bargaining history." *Tackett*, 135 S. Ct. at 938 (Ginsburg, J., concurring).

## A.  The term "produced"

The district court interpreted what it means to "produce" a motion picture under the Basic Agreement before turning to whether Article 3 applies any time a Producer "produces" a motion picture. We take the same two-step approach. The Basic Agreement does not define "produced," but other provisions of the Basic Agreement use "produced" in connection with motion pictures. For example, Article 1 defines "theatrical motion pictures" as those motion pictures "produced by means of motion picture cameras, electronic cameras or devices, tape devices or any combination of the foregoing or any other means, methods of devices now used or which may hereafter be adopted." Under Article 9, a Producer "agree[s] not to produce, distribute or make use of 16mm film with music sound track produced within the United States and/or Canada, unless such music sound track is recorded by live musicians specifically for that picture." Both provisions indicate that if one shoots or films a picture by any of several means, one "produces" a motion picture; indeed, such a conclusion accords with a common-sense understanding of how a motion picture goes from script to screen.

However, Article 3 is ambiguous about the range of "shooting" actions that "produced" encompasses. Does Article 3 apply only to the employment of the person holding a camera or other filming device, as Paramount contends? Or does Article 3 apply to any entity that takes actions "at all phases of production" that relate the shooting of a motion picture, as AFM contends? Because on its face "produced" is susceptible to multiple reasonable interpretations, we turn to the parties' bargaining history.

That extrinsic evidence demonstrates that both AFM and Paramount negotiators understood "produced" for purposes of Article 3 to include activities in relation to the shooting of "principal photography." For example, an AFM member who participated in bargaining testified that a motion picture is produced "where the photography was done" – with photography meaning "principal photography," not "second-unit work" or "establishing stuff." Paramount's bargaining representative had a similar understanding: "[A] simplified version of [Article 3] is if you shoot your theatrical motion picture in the US or Canada, then you must score it in the US or Canada." Another AMPTP negotiator declared that "produced" in Article 3 "refers to shooting the motion picture and the associated tasks, such as hiring cast and crew, selecting shooting locations, determining a production schedule, and preparing and monitoring a production budget." Finally, AFM's former general counsel testified that in negotiations, both AFM and Paramount understood that "where the place of principal photography took place was, in fact, the determinant of where it was produced by the producer" under Article 3.

We therefore agree with the district court that a Producer "produce[s]" a motion picture for purposes of Article 3 if the

Producer takes actions associated with shooting principal photography. *See Ariz. Laborers*, 753 F.2d at 1518 n.9 ("Contrary inferences are not possible where undisputed and conclusive evidence as to the intent of the parties is before the court.").

As the district court suggested, however, Paramount's interpretation of "produced" – limited only to the direct employment of the case and crew – is too narrow. We conclude below that Article 3 extends to actions associated with shooting principal photography, including involvement in hiring, budget, and shooting decisions related to principal photography, not just direct employment.[7]

## B.  Applicability of Article

The district court appeared to conclude that even though the Basic Agreement relates to the employment of musicians, Article 3 applies only when a Producer employs the cast and crew of a motion picture. Paramount urges the same interpretation. But the Basic Agreement imposes no such requirement. As we explain below, because the Basic Agreement relates to the hiring and employment of *musicians*, not the cast and crew, Article 3 applies whenever a Producer produces a motion picture and has authority over the hiring and employment of scoring musicians.

---

[7] For our purposes, the pertinent question is what "produced" means under Article 3. We conclude here that an entity "produce[s]" for purposes of that Article if it is involved in principal photography. We need not decide whether, under parts of the Basis Agreement other than Article 3, an entity "produces" or is a "producer" if it is *not* involved in principal photography.

A work preservation clause "ha[s] as its objective the preservation of work traditionally performed by employees represented by the union." *NLRB v. Int'l Longshoremen's Ass'n, AFL-CIO* ("*ILA I*"), 447 U.S. 490, 504 (1980). For example, a work preservation clause may prevent the employer from subcontracting work traditionally performed by the union. *See George Day Constr. Co. v. United Bhd. of Carpenters & Joiners of Am., Local 354*, 722 F.2d 1471, 1482 (9th Cir. 1984). Similarly, Article 3 ensures that studios who produce their motion pictures domestically preserve the scoring work on those motion pictures for AFM members.

The district court misinterpreted the scope of Article 3. First, the court's conclusion that a Producer must employ "the employees covered under the CBA during the making and shooting a motion picture" is not tenable. If Article 3 applies only once a studio has engaged musicians to score a motion picture, Article 3's purpose is simply to ensure that those musicians score the motion picture in the United States. That interpretation renders Article 3 a practical nullity. *See Alday*, 693 F.3d at 784 ("As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.") (citation and internal quotation marks omitted). Indeed, Paramount does not attempt to defend that interpretation on appeal.

Second, the district court's conclusion that Article 3 applies only if the Producer employs the cast and crew shooting a picture is not supported by the Basic Agreement. The district court's misinterpretation is understandable. By its terms, the Basic Agreement concerns the hiring and employment of scoring musicians. Article 1 states that the Basic Agreement applies to "employees" and "conductors, featured instrumental musicians[,] and orchestras, employed

by the Producer." The Basic Agreement sets forth standards for how a Producer must notify musicians of a day's assignment, request overnight work, or request that a musician use a certain instrument. Those are actions only an employer can take. But the district court erred in focusing on whether a producing Producer is employing the *cast and crew* to determine whether the Producer could employ musicians.

As Paramount itself explained, scoring occurs in post-production. It is a process separate from the shooting of a motion picture (and was separate on *SKODAM*). Applying Article 3 only to the entity employing the cast and crew presumes that just one entity can "produce" a motion picture and that the same entity controls both production and post-production. But there is record evidence that both SKODAM Films and Paramount, to a lesser degree, took actions related to shooting principal photography. Nowhere does Article 3 contemplate that only one entity produces a motion picture. Moreover, applying Article 3 only to the employer of the cast and crew means that, where there are multiple producers, a signatory could avoid its Basic Agreement obligations by having a different entity employ the cast and crew.

That does not mean that Article 3 requires that the Basic Agreement apply anytime a Producer helps shoot principal photography on a motion picture. Rather, the Basic Agreement requires that Article 3 necessarily applies only when a signatory Producer is involved in hiring and employing musicians. Given the particular way in which scoring musicians are hired, a motion picture studio may not directly hire musicians. A composer or music contractor may directly hire and supervise musicians. The Basic Agreement makes sense only if the studio with authority over the composer is the musicians' employer. After all, the Basic

Agreement is a labor agreement between musicians and studios, not musicians and composers, and it refers to the Producer studios as the musicians' employers.

Notably, the National Labor Relations Board explicitly addressed the employment status of musicians relative to a different set of motion picture studios in *Independent Motion Picture Producers Ass'n*, 123 N.L.R.B. 1942 (1959). The Board there concluded that, given the "facts, circumstances, and bargaining practices prevailing in the motion picture production industry . . . the independent motion picture producers are employers of the musicians who score the music for their pictures within the meaning of the Act, irrespective of the nature of the supervisory or managerial authority or other relationship of the orchestra manager, composer-conductor, or contractor to the musicians." *Id.* at 1947. The Board's logic applies equally here. As Paramount conceded in its brief: "[i]t remains the case that the producing entity controls scoring through its composer and/or contractor."

Therefore, a Producer can have authority over the hiring and employment of musicians, triggering its obligations under Article 3, when it has authority over the composer and music contractor who hire the musicians. Under Article 3, the signatory Producer must also "produce" the motion picture by taking actions associated with shooting principal photography. If so, Article 3 applies, and the Producer must score the motion picture in the United States or Canada.

## C. Record evidence

We further conclude that on the summary judgment record, there is a genuine dispute of material fact whether

Paramount's connection to *SKODAM* triggered its obligations under Article 3 of the Basic Agreement. Specifically, a jury could conclude on this record that Paramount took actions to shoot the principal photography on *SKODAM* and had control over the hiring of scoring musicians.

First, as the district court determined, there is record evidence that Paramount "made" or "shot" *SKODAM*; i.e., that Paramount was involved in hiring, budget, and shooting decisions related to principal photography. For example, Paramount's head of casting "approved" certain actors that Mary Parent selected for the picture. During principal photography, multiple Paramount employees reviewed the principal photography dailies, the daily film output from *SKODAM*'s shoot in Mississippi. After reviewing the dailies, a Paramount executive made suggestions to the *SKODAM* director relating to the "pace" of shooting and specific scenes. Paramount was contractually entitled to approve the budget, screenplay, director, and lead cast under the Co-Financing and Distribution Agreement. By contract, Paramount also had "final say" over material creative decisions relating to production.

Second, there is record evidence that Paramount had authority over the selection of scoring musicians. For example, Paramount had the right to approve the composer, owned ▮▮▮% rights to soundtrack royalties, and signed off on the Composer Agreement, which warranted that the scoring of the picture would not trigger AFM's rights. Paramount took other actions indicative of authority over the picture's scoring. Spendlove, the Paramount music executive, called Paesano to discuss the motion picture and test score. Paramount helped choose and price songs for the score. And Paesano's representative reached out to

Paramount regarding "union v. non union recordings." On this record, a jury could conclude that Paramount exercised control over the composer and music contractor such that it had the requisite authority under Article 3 to preserve work for AFM's scoring musicians.

Paramount contends that it was only a "distributor" of *SKODAM*. A jury may agree. But a signatory Producer who contracts to "distribute" a motion picture is not, by virtue of that responsibility, exempt from the Basic Agreement. And under Article 3, the Producer's actions and contractual authority matter. Because AFM has raised a genuine dispute of material fact whether Paramount's actions on *SKODAM* triggered its obligation under Article 3 to score the motion picture in the United States, the district court erred in granting summary judgment to Paramount on AFM's breach of contract claim.

## III.    Paramount's "Hot Cargo" Defense

Paramount contends that § 8(e), the "hot cargo" provision of the NLRA, 29 U.S.C. § 158(e), provides an alternative basis for affirming the district court. Paramount raised this affirmative defense in district court, but the court did not reach it. We may affirm the district court's grant of summary judgment "on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that ground." *Brennan v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 748 (9th Cir. 2012) (citation and internal quotation marks omitted). For the sake of efficiency, we elect to consider Paramount's affirmative defense. Our conclusion that Article 3 is a valid work preservation provision forecloses the "hot cargo" defense.

Section 8(e) of the NLRA prohibits an employer from entering into an agreement "whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person."[8]   Any such agreement is "to such extent unenforceable and void." *Id.*  The Supreme Court has interpreted § 8(e) to prohibit "secondary" union pressure to force an employer to enter such an agreement. *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 645 (1967). As we have explained:

> Union pressure is secondary when it is brought to bear upon a neutral or secondary employer for the purpose of forcing that neutral or secondary employer to apply pressure to the primary employer . . . .  The tactical objective of secondary pressure is not to influence the labor policy of the neutral employer against whom it is directed, but to influence the labor policy of the primary employer.

*NLRB v. Hotel & Rest. Emps. & Bartenders' Union Local 531*, 623 F.2d 61, 65–66 (9th Cir. 1980).  Essentially, § 8(e) "prohibits employers and unions from entering into contracts

---

[8] Section 8(e) is known as the hot cargo provision because it prohibits agreements where "a union and employer agree to the have the employer cease handling the goods of another or cease doing business with any other person." *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1152 n.3 (9th Cir. 2013).  Such goods are the "hot cargo."

designed to involve neutral employers in labor disputes not their own." *Id.* at 66.

Paramount asserts that AFM's suit to enforce Article 3 violates § 8(e) because AFM's tactical objective is to force SKODAM Films – a neutral employer – to employ AFM musicians. However, § 8(e) does not apply to valid work preservation agreements. *ILA I*, 447 U.S. at 504. Under the two-part test established by the Supreme Court in *ILA I*, a work preservation clause is valid if it seeks to preserve "'work traditionally performed by employees represented by the union . . .'" and "the contracting employer [has] the power to give the employees the work in question.'" *Dist. Council No. 16 of Int'l Union of Painters & Allied Trades, Glaziers, Architectural Metal & Glass Workers, Local 1621 v. B & B Glass, Inc.*, 510 F.3d 851, 857 (9th Cir. 2007) (quoting *ILA I*, 447 U.S. at 504). "Only where a work preservation provision is 'tactically calculated' to further union objectives other than preservation of bargaining unit work is § 8(e) violated." *Id.* (quoting *ILA I*, 447 U.S. at 504–05).

Our conclusion that there is a genuine dispute of material fact whether Paramount had authority over the hiring and employment of scoring musicians prevents summary judgment on the hot cargo defense. If Paramount had authority over the scoring musicians via its contractual control over the composer's selection, Paramount had "the power to give the employees the work in question." *See id*. The record thus does not permit us to decide as a matter of law that Article 3 is not a valid work preservation provision.

### CONCLUSION

We interpret Article 3 of the Basic Agreement to apply when a signatory Producer "produces" a motion picture by taking actions associated with shooting principal photography for a motion picture in the United States and has authority over the hiring and employment of scoring musicians. Article 3 requires such a Producer to score the motion picture in the United States or Canada using AFM musicians. If the Producer does not do so, the Producer is in breach of the Basic Agreement. Because, on this record, there is a genuine dispute of material fact whether Paramount's involvement in *SKODAM* triggered the application of Article 3, the district court erred in granting summary judgment to Paramount.

•  ●  •

The judgment of the district court is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.